UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| THE GROVES IN LINCOLN, INC., *et al.*, | ) | CHAPTER 11 |
| | ) | CASE NO. 13-11329-HJB |
| | ) | |
| Debtors.[1] | ) | (*Jointly Administered*) |
| | ) | |

## DEBTORS' SECOND AMENDED CHAPTER 11 PLAN
## DATED JULY 9, 2013

The Groves in Lincoln, Inc. ("Groves") and its wholly-owned subsidiary The Apartments at Groves, Inc. ("Apartments"), each a Massachusetts not-for-profit corporation and a debtor in the above-captioned cases (collectively, the "Debtors"), propose the following plan pursuant to Section 1121 of the Bankruptcy Code (the "Plan"):

## SECTION 1
## DEFINITIONS

**1.1**    **General**.  Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in the Plan.  Such meanings shall be equally applicable to both the singular and plural points of such terms.  Any term that is not defined herein but that is defined in the Bankruptcy Code shall have the meaning assigned to such term in the Bankruptcy Code.

**1.2**    **Administrative Claim** means that portion of a Claim that is asserted to be, or in the case of an Allowed Claim, has been Allowed as being, entitled to priority under Code Section 507(a)(2).

**1.3**    **Allowed** means:

(a)    with respect to a Claim other than an Administrative Claim, any Claim (i) either listed in the Schedules and not listed therein as contingent, unliquidated or disputed, (ii) as to which a proof of claim was filed on or before the Bar Date and either (A) was allowed by Final Order, but only in the amount so allowed or (B) to which no objection has been filed by the Objection Deadline, or (iii) allowed pursuant to the terms of this Plan.

---

[1] The debtors in these jointly administered chapter 11 cases, along with the last four digits of each debtors' federal tax identification number, are: The Groves in Lincoln, Inc. f/k/a The Groves in Lincoln – Deaconess, Inc. (0778), and The Apartments at The Groves, Inc. f/k/a The Groves Apartments – Deaconess, Inc. (0696).

(b)    with respect to an Administrative Claim, any Claim (i) consisting of an undisputed obligation incurred in the ordinary course as to which payment has been made, (ii) consisting of a Claim by a Professional Persons for compensation or reimbursement of related expenses or the Claim of a Creditors' Committee member for reimbursement of expenses rendered or incurred before the Effective Date, to the extent applied for, on or before the Postpetition Bar Date and allowed by Final Order, or (iii) consisting of any other Administrative Claim (A) as to which a proof of claim or request for payment is filed by the Postpetition Bar Date and (B) either (1) to which no objection has been filed by the Objection Deadline, or (2) allowed by Final Order, but only to the extent so allowed.

**1.4**    **Allowed Amount** means, subject to Section 7.10, the amount of any Allowed Claim.

**1.5**    **APA** means the Asset Purchase Agreement between the Debtors and BSL dated February 8, 2013, as amended, a copy of which is annexed to the Sale Motion.

**1.6**    **Apartment Lease** means a lease between either of the Debtors and a natural person or persons relating to such person's rental of an apartment unit at the Facility.

**1.7**    **Bankruptcy Code** means Title 11 of the United States Code, as in effect with respect to the Cases.

**1.8**    **Bar Date** means June 27, 2013, or such later date established by the Bar Order (or by agreement of the Debtors, prior to the Effective Date, or the Plan Trustee from and after the Effective Date) with respect to a particular Claim as the deadline by which a proof of claim therefor must be filed, *provided, however,* that as to any Claim subject to a deadline by which a proof of claim therefor must be filed established by an Order other than the Bar Order, the Bar Date shall be the deadline established by such other Order.

**1.9**    **Bar Order** means the Order Establishing Bar Date and Granting Related Relief entered May 13, 2013 [Docket No. 155], which, *inter alia*, established the Bar Date as the deadline for filing proofs of claim as to certain Claims.

**1.10**    **Bonds** means (a) the $41,940,000 Massachusetts Development Finance Agency Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009A, (b) $34,750,000 Massachusetts Development Finance Agency Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009B-1 Tax Exempt Mandatory Paydown Securities (TEMPS-85$^{SM}$), and (c) $40,575,000 Massachusetts Development Finance Agency Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009B-2 Tax Exempt Mandatory Paydown Securities (TEMPS-50$^{SM}$) issued on November 24, 2009 upon the terms and for the purposes set forth in the Loan Agreement.

**1.11**    **Bond Claims** means all Claims against the Debtors based upon legal or beneficial ownership of Bonds and all related claims, rights, powers and causes of action arising out of or in connection with or otherwise relating to such Bonds, which amount is not less than $88,430,000.

2

**1.12    Bond Fund** means the Bond Fund held by the Bond Trustee pursuant to, and established under, the terms of the Loan Agreement.

**1.13    Bond Trustee** means Wells Fargo Bank, N.A., in its capacity as trustee for the holders of the Bonds, and any successor.

**1.14    Bond Trustee Funds** means funds held by the Bond Trustee pursuant to, and established under, the Loan Agreement, including but not limited to the Debt Service Reserve Fund and the Bond Fund, but excluding the Operating Reserve Fund.

**1.15    BSL** means BSL Lincoln, LLC or its designees as set forth in the Sale Order.

**1.16    Business Day** means a day other than Saturday, Sunday or a legal holiday defined in Fed. R. Bankr. P. 9006(a) as applicable in Massachusetts.

**1.17    Cases** means the jointly-administered cases under the Bankruptcy Code pending in the Court as to Groves (*In re The Groves in Lincoln, Inc.*, Case No. 13-11329-HJB) and as to Apartments (*In re The Apartments at The Groves, Inc.*, Case No. 13-11330-HJB).

**1.18    Case Closing Date** means the date of entry of an Order consisting of a final decree closing the Cases pursuant to Code Section 350.

**1.19    Cash** means (a) in reference to disbursement of funds at the Closing, payment by wire transfer directly from the Sale Proceeds, (b) in reference to any other disbursement of funds to the Bond Trustee on the Effective Date, payment by wire transfer of Groves or MHS, and (c) in reference to any other disbursement, payment by check or wire transfer of the Plan Trustee.

**1.20    Cash Collateral Orders** means the Final Cash Collateral Order and the Interim Order Authorizing Use of Cash Collateral and Providing Adequate Protection entered by the Court on March 13, 2013 [Docket No. 45].

**1.21    Claim** means a claim, as defined in Code Section 101(5), against the Debtors, or either of them, that currently exists or arises before the Effective Date.

**1.22    Closing** means the Closing pursuant to and as defined in the APA.

**1.23    Code Section** means, except where otherwise indicated, a Section of the Bankruptcy Code as in effect with respect to the Cases.

**1.24    Confirmation Order** means the Order confirming the Plan pursuant to Code Section 1129.

**1.25    Contingent Payment** means the payment of up to $5,000,000 provided for under the APA that is contingent upon the success and timing of BSL's receipt of approvals to construct an Assisted Living/Alzheimer's Care facility at the Debtors' site in addition to the already-existing Facility.

**1.26    Court** means the United States Bankruptcy Court for the District of Massachusetts (Eastern Division), or any other court with jurisdiction over (a) the Cases, (b) any particular matter within the Cases pursuant to 28 U.S.C. § 157(c)(1) or (d), or (c) any particular Claim pursuant to 28 U.S.C. §§ 157(b)(5), 959(a) or 1334(c).

**1.27    Creditors' Committee** means the Official Committee of Unsecured Creditors appointed pursuant to Code Section 1102(a), as such committee may be constituted from time to time.

**1.28    Cure Costs** means, as to an executory contract assumed by BSL pursuant to Section 9.2, any and all amounts payable under Code Section 365(b)(1)(A) and (B).

**1.29    Deaconess** means New England Deaconess Association - Abundant Life Communities, Inc., a Massachusetts not-for-profit corporation that is a member of Groves.

**1.30    Debt Service Reserve Fund** means the Debt Service Reserve Fund held by the Bond Trustee pursuant to, and established under, the terms of the Loan Agreement.

**1.31    Debtors** has the meaning set forth in the preamble to the Plan.

**1.32    Disallowed** as to any Claim means either (a) disallowed by Final Order, but (in the case of a partially-Allowed Claim) only to the extent so disallowed, (b) not filed by the Bar Date, if applicable, or otherwise by the Postpetition Bar Date, if applicable, or (c) treated as disallowed pursuant to Section 7.1 or Section 7.10.

**1.33    Effective Date** means the date on which the conditions set forth in Section 10 have been satisfied.

**1.34    Employee Settlement Amounts** means such amounts, not to exceed $35,000 in the aggregate, as may be agreed by the Debtors (or, after the Effective Date, the Plan Trustee) with any current or former employee, and authorized by the Court, to be paid to any such employee in settlement of potential Claims for underpayment of wages. For the avoidance of doubt, the Employee Settlement Amounts are Allowed Administrative Claims regardless of the extent to which the underlying Claims that were settled would have been Allowed or entitled to priority under Code Section 507(a).

**1.35    Entrance Fee Escrow Agreement** means the Escrow Agreement for the Benefit of Residents dated January 25, 2013 and the Escrow Related Agreement dated January 25, 2013.

**1.36    Exhibit B Bondholders** means those holders of Bond Claims identified in the Schedule of Bondholder Participants in Plan Negotiations annexed as Exhibit B to the Plan.

**1.37    Facility** means the senior living facility in Lincoln, Massachusetts, owned and operated by the Debtors and commonly known as The Groves in Lincoln.

**1.38    Final Cash Collateral Order** means the Final Order Authorizing Use of Cash Collateral and Providing Adequate Protection entered by the Court on April 22, 2013 [Docket

No. 139], or such other Order authorizing the Debtors' use of cash collateral as may be in effect on the Effective Date.

**1.39    Final Order** means an Order as to which (a) the time has expired within which a proceeding for judicial review (whether by way of rehearing, appeal, *certiorari* or otherwise, but not pursuant to Code Section 1144, Fed. R. Bankr. P. 9024, Fed. R. Civ. P. 60(b) or any similar rule) may be commenced, without any such proceeding having been commenced, or (b) if such a proceeding has been timely commenced, such Order has been affirmed by the highest tribunal in which review is sought or such proceeding for review has otherwise been terminated without modification of such Order, and the time has expired within which any further proceeding for judicial review may be commenced.

**1.40    General Unsecured Claim** means any unsecured Claim, including without limitation any unsecured Claim arising from the rejection or termination of an executory contract or unexpired lease, that is not a Priority Claim.

**1.41    General Unsecured Fund** means a fund that is being made available under the Plan for payment of General Unsecured Claims in an amount equal to 50% of all Allowed General Unsecured Claims, not to exceed $32,500.

**1.42    ICA Amount** means the payment due to the Debtors' Chief Financial Officer upon occurrence of the Closing, pursuant to the Incentive Compensation Agreement between the Debtors and their Chief Financial Officer dated as of January 25, 2013.

**1.43    Liquidity Support Agreement** means the Liquidity Support Agreement dated as of November 1, 2009 among the Debtors, the Bond Trustee and MHS, as amended by the First Amendment to Liquidity Support Agreement dated November 18, 2011, as further amended by the Second Amendment to Liquidity Support Agreement dated as of January 25, 2013.

**1.44    Loan Agreement** means the Mortgage, Security, Loan and Trust Agreement dated as of November 1, 2009, as amended, between the issuer of the Bonds, the Bond Trustee, and Groves, executed in connection with issuance of the Bonds.

**1.45    Member** means MHS and Deaconess in their capacity as members of Groves.

**1.46    Member Claim** means any General Unsecured Claim of a Member against Groves or Apartments.

**1.47    Member Claims Agreement** means the agreement by and among Groves, Deaconess and MHS dated May 29, 2013, of which a copy is annexed hereto as Exhibit A.

**1.48    MHS** means Masonic Health Systems of Massachusetts, Inc., a Massachusetts not-for-profit corporation that is a member of Groves.

**1.49    MHS Contribution** means, as of the Effective Date, the amount that MHS is required to pay the Bond Trustee pursuant to the Liquidity Support Agreement.

**1.50    Objection Deadline** means, except as extended or shortened pursuant to Section 7.4(c): (a) in respect of an Administrative Claim, the first Business Day after the thirtieth (30th) day following the Postpetition Bar Date; and (b) in respect of any other Claim, the first Business Day after the thirtieth (30th) day following the Effective Date.

**1.51    Operating Reserve Fund** means the Operating Reserve Fund held by the Bond Trustee pursuant to, and established under, the terms of the Loan Agreement subject, since the Petition Date, to the provisions of the Cash Collateral Orders.

**1.52    Order** means an order or judgment of the Court.

**1.53    Petition Date** means March 11, 2013.

**1.54    Plan** means this plan, as it may be amended or modified by the Debtors from time to time as permitted herein or under the Bankruptcy Code.

**1.55    Plan Expense** means an expense or other liability incurred by the Plan Trustee in performing the Plan Trustee's duties under the Plan, including but not limited to fees and expenses of the Plan Trustee and persons engaged by him pursuant to Section 6.8, but only to the extent that such liability would have been allowable as an administrative expense under Code Section 503(b) if incurred by the Debtors' estates before the Effective Date.

**1.56    Plan Trustee** means the person serving from time to time as Plan Trustee under the Plan in accordance with Sections 6.1 or 6.2.

**1.57    Plan Trustee Required Amount** means the sum of (a) $200,000 for Plan Expenses, which may be reduced as provided in Section 5.6 below, (b) the Plan Trustee's estimate of all amounts to become payable to Professional Persons on or after the Effective Date pursuant to Section 2.3 for services rendered prior to the Effective Date, (c) amounts of all other Administrative Expenses (including Employee Settlement Amounts) projected by the Plan Trustee to be payable under Section 2.1, (d) Allowed or Unresolved Class 3 Claims, if any, and (e) except as otherwise provided in Section 5.1(b)(iv), the General Unsecured Fund (provided, however, to the extent (i) MHS would have been entitled to a rebate or reduction of its payment of the General Unsecured Fund pursuant to Section 5.1(b)(iv) or otherwise if it had been required to make such payment, and (ii) the General Unsecured Fund was included in the Plan Trustee Required Amount for the reason that the Sale did not occur prior to the Effective Date, then the Bond Trustee shall be entitled to receive any such refunds and shall be the beneficiary of any such reductions).

**1.58    Postpetition Bar Date** means the first Business Day following the thirtieth (30th) day after the Effective Date.

**1.59    Priority Claim** means Administrative Claims, Priority Tax Claims, and Priority Non-Tax Claims.

**1.60    Priority Non-Tax Claim** means that portion of a Claim which is filed, or in the case of an Allowed Claim, has been Allowed, as entitled to priority in accordance with Code Section 507(a)(3)-(7) and (9).

**1.61     Priority Tax Claim** means that portion of a Claim that is filed, or in the case of an Allowed Claim, has been Allowed, as entitled to priority under Code Section 507(a)(8).

**1.62     Professional Persons** means professionals employed by the Debtors pursuant to Code Section 327 or by an official committee pursuant to Code Section 1103(a).

**1.63     Pro Rata Share** means, in respect of any Allowed General Unsecured Claim, the greater of (a) 50% of the Allowed Amount of such Claim, or (b) the amount of the General Unsecured Fund *times* the Allowed Amount of such Claim *divided by* the aggregate amount of all Allowed and Unresolved General Unsecured Claims.

**1.64     Purchased Assets** means the Purchased Assets that the Debtors are obligated to convey to BSL at the Closing pursuant to the APA.

**1.65     RBC** means RBC Capital Markets, LLC.

**1.66     RBC Agreement** means the Investment Banking Agreement between the Debtors and RBC dated August 2, 2012.

**1.67     Released Parties** means (a) Benchmark Assisted Living, LLC, BSL, Deaconess, MHS, the Bond Trustee, the Exhibit B Bondholders, the Creditors' Committee, along with their respective current and former directors, officers, members, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns, and (b) the Debtors' current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns.  For the avoidance of doubt, the Released Parties do not include the Debtors.

**1.68     Residency Agreement** means any agreement in effect as of the Petition Date or the Effective Date, including an Apartment Lease, between Groves and a natural person or persons relating to such person's current, former or future occupancy of a unit at the Facility, excluding agreements terminated before March 1, 2013.

**1.69     Resident** means, as of the Effective Date, (a) a person residing or having the right to reside at the Facility pursuant to a Residency Agreement (including an Apartment Lease), (b) a person who has signed a Residency Agreement and whose deposit thereunder has been accepted by Groves, and (c) a person who has the right to receive a refund or payment of any type under a Residency Agreement.

**1.70     Sale** means the transaction authorized by the Sale Order.

**1.71     Sale Motion** means the Debtors' Motion to (a) Authorize Sale of Substantially All of their Assets Free and Clear of All Liens and Other Interests, (b) Authorize Assumption and Assignment of Certain Contracts and Leases in Connection Therewith, (c) to Approve Sale Procedures Therefor, and (d) for Other Related Relief  filed March 11, 2013 [Docket No. 12].

**1.72     Sale Order** means the Order granting the Sale Motion.

**1.73    Sale Proceeds** means the required amounts to be paid by BSL to the Debtors for the Purchased Assets pursuant to the terms and conditions of the APA.

**1.74    Schedules** mean the schedules of assets and liabilities filed by the Debtors in the Cases, as amended through and including the Effective Date.

**1.75    Secured** means, as to any Claim secured by a lien on property of the Debtors' estate, the portion of such Claim equal to the lesser of (a) the full amount thereof or (b) the value of such property determined by (i) agreement between the Debtors and the holder of such Claim, or (ii) in the absence thereof, the Court pursuant to Code Section 506(a).

**1.76    Sweep Amounts** means the funds the Plan Trustee may be required to remit to the Bond Trustee pursuant to the penultimate sentence of Section 6.13.

**1.77    Unresolved** means any Claim that has not been Allowed or Disallowed.  The amount of any Unresolved Claim shall be the amount asserted by the holder thereof through the filing of a proof of claim on or before the Bar Date or, as applicable, the Postpetition Bar Date.

**1.78    Unsecured** means, as to any Claim, the amount thereof other than the amount (if any) constituting a Secured Claim.

## SECTION 2
## TREATMENT OF NON-CLASSIFIED CLAIMS

**2.1    Administrative Claims**.  Subject to Sections 2.2 and 2.3 of the Plan and except as otherwise agreed by the Plan Trustee and the holder of an Administrative Claim, each Allowed Administrative Claim shall be paid in full in Cash on the Effective Date.

**2.2    Bankruptcy Fees.**  Any Administrative Claim for fees under 28 U.S.C. § 1930 due and payable prior to entry of the Confirmation Order shall be paid in full in Cash on the Effective Date or, in the case of amounts not yet billed by the United States Trustee as of the Effective Date, within ten Business Days after receipt of an invoice therefor.  The Plan Trustee's acquisition of control over funds of the Debtors' estates pursuant to Section 6.3 shall not constitute a disbursement for purposes of computing fees payable under 28 U.S.C. § 1930.

**2.3    Professional Persons.**  Compensation and reimbursement of expenses of a Professional Person through the Effective Date shall be paid in Cash on the earlier of (a) the date when due under any Order concerning compensation procedures for Professional Persons that is in effect as of the Effective Date (the terms of such Order are hereby incorporated into the Plan from and after the Effective Date), or (b) on the Business Day following entry of an Order allowing an application therefor.

**2.4    Post-Effective Date Professional Services.**  Compensation and reimbursement for services rendered from and after the Effective Date by professionals engaged by the Plan Trustee pursuant to Section 6.8 shall be paid by the Plan Trustee in accordance with Section 6.9. Any Professional Person so engaged by the Plan Trustee shall apply any retainer that such Professional Person is holding to invoices rendered to the Plan Trustee after receiving written notification from the Plan Trustee that the Plan Trustee has no objection to such invoice and all

deadlines set forth in Section 6.9 hereof have passed and the Plan Trustee has not received any objection from the Bond Trustee to the payment of such invoice.  Any Professional Person not so engaged shall apply any retainer to the final compensation awarded by the Court pursuant to Section 2.3, and shall refund any unused retainer balance to the Plan Trustee.

**2.5** **Priority Tax Claims.**  Each Allowed Priority Tax Claim shall be paid in full in Cash on the Effective Date.

## SECTION 3
## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

**3.1** Claims that are required to be classified under Code Section 1123(a)(1) and Interests are hereby classified into the following classes:

(a) *Class 1*, consisting of all Bond Claims, whether Secured Claims or General Unsecured Claims.

(b) *Class 2-A*, consisting of the Secured Claim of Terex Financial Services in the amount of $12,346.00 as of the Petition Date.

(c) *Class 2-B*, consisting of the Secured Claims of Ally Financial in the total amount of $58,494.00 as of the Petition Date.

(d) *Class 2-C*, consisting of the Secured Claim of Kubota Credit Corporation, U.S.A. in the amount of $11,765.00 as of the Petition Date.

(e) *Class 3*, consisting of all Priority Non-Tax Claims.

(f) *Class 4*, consisting of all General Unsecured Claims against Groves, other than Member Claims and Bond Claims.

(g) *Class 5*, consisting of all General Unsecured Claims against Apartments other than Member Claims and Bond Claims.

(h) *Class 6*, consisting of all Member Claims.

(i) *Class 7*, consisting of all member interests in Groves.

(j) *Class 8*, consisting of all member interests in Apartments.

## SECTION 4
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

**4.1** **Class 1 (Bond Claims).**  Class 1 is impaired.  Each Class 1 Claim shall be deemed Allowed as of the Effective Date in such amount as is reflected in the records of the Bond Trustee as the outstanding amount of the Bonds on which such Claim is based.  In full settlement and satisfaction of all Allowed Class 1 Claims, the Bond Trustee shall receive (as set forth in Section 5) or retain, as the case may be, for disbursement under the terms of the Loan

Agreement, (a) all Sale Proceeds except as provided in Section 5.1(a)(ii)(A) and (B); (b) the Bond Trustee Funds; (c) the Operating Reserve Fund; (d) amounts distributed to the Bond Trustee from the Entrance Fee Escrow Agreement pursuant to Section 5.1(a)(iii)(b)(ii); (e) that portion of the MHS Contribution as set forth in Section 5.5; (f) those amounts held in the Debtors' bank accounts as set forth in Section 5.3; (g) any amount realized by the Plan Trustee from sale of Apartments pursuant to Section 4.8; (h) the Sweep Amounts (as and when provided under this Plan); and (i) the Contingent Payment, which shall be paid in full when due and owing under the APA and shall be paid directly by BSL to the Bond Trustee.  Class 1 waives the application of clauses (ii) and (iv) of Section 19 of the Final Cash Collateral Order to the extent that they would cause a Termination Event under such Order to result from occurrence of the Effective Date or appointment of the Plan Trustee.

**4.2    Classes 2-A, 2-B and 2-C (Other Secured Claims).**  Classes 2-A, 2-B and 2-C are unimpaired.  Each Allowed Class 2-A Claim, Allowed Class 2-B Claim and Allowed Class 2-C Claim, less any amount paid since the Petition Date, shall (to the extent not previously paid) be paid from the Sale Proceeds as set forth in Section 5.1(a).

**4.3    Class 3 (Priority Non-Tax Claims).**  Class 3 is unimpaired.  The Plan Trustee shall pay in full each Allowed Class 3 Claim in Cash on the Effective Date.

**4.4    Class 4 (Groves General Unsecured Claims).**  Class 4 is impaired.  The Plan Trustee shall pay each Allowed Class 4 Claim in accordance with Section 7.2.

**4.5    Class 5 (Apartments General Unsecured Claims).**  Class 5 is impaired.  The Plan Trustee shall pay each Allowed Class 5 Claim in accordance with Section 7.2.

**4.6    Class 6 (Member Claims).**  Class 6 is unimpaired.  Pursuant to the Member Claims Agreement, all Member Claims are waived as of the Effective Date.

**4.7    Class 7 (Member Interests in Groves).**  Class 7 is unimpaired.  Pursuant to the Member Claims Agreement, any right to receive or retain property on account of the Members' interests in Groves is waived as of the Effective Date.

**4.8    Class 8 (Interests in Apartments).**  Class 8 is unimpaired.  Through the Plan Trustee, Groves shall remain the sole member of Apartments, *provided, however,* that if the Plan Trustee is able to realize any value from disposition of Apartments as an entity or collection of any Claims against Apartments, then he shall remit the amount thereof to the Bond Trustee.

### SECTION 5
### MEANS OF IMPLEMENTATION

**5.1    Sale of the Purchased Assets.**

(a)    **Sale Pursuant to Plan.**  If the Closing has not occurred prior to the date on which the conditions to occurrence of the Effective Date set forth in Section 10.1(a) and (b) have been satisfied, then the Sale shall take place pursuant to the Plan, in which event:

(i)     **Effective Date.**  The Effective Date shall occur on the same date as the Closing, provided that the Closing is completed in accordance with the terms of the APA.

(ii)    **Sale Proceeds at Closing**.  At the Closing, the Sale Proceeds shall be distributed as follows: (A) the amount payable at the Closing under the RBC Agreement shall be paid to RBC by wire transfer; (B) the amount of the Allowed Class 2-A Claims, Allowed Class 2-B Claims and Allowed Class 2-C Claims, which shall not exceed the amounts set forth in Sections 3.1(b)-(d), shall be paid to the respective holders of such Claims; and (C) the balance shall be paid to the Bond Trustee by wire transfer.

(iii)   **Entrance Fee Escrow Agreement.**  At the Closing, (a) the Debtors shall deliver to the escrow agent under the Entrance Fee Escrow Agreement a Certificate of Occurrence of Stabilization and Assumption, as defined therein, and (b) such escrow agent (i) shall, notwithstanding the terms of the Entrance Fee Escrow Agreement, disburse the Escrow Funds thereunder (and as defined therein) to BSL in an amount equal to that portion of the Entrance Fee Escrow Funds that constitute Purchased Assets pursuant to section 2(b)(xix) of the APA, and (ii) shall disburse the balance to the Bond Trustee.

(iv)    **Title to Purchased Assets.**  The transfer of the Purchased Assets to BSL at the Closing shall be free and clear of any and all Encumbrances, except for Permitted Encumbrances (as each term is defined in the APA).  Accordingly, except for the Permitted Encumbrances and Assumed Liabilities (as each term is defined in the APA), BSL and its current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns shall not be liable for any claim of any nature whatsoever against the Debtors, any of their predecessors or affiliates, or the Purchased Assets, whether known or unknown as of the time of the Closing, then existing or thereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.  Without limiting the generality of the foregoing, BSL and its employees, officers, directors, advisors, lenders, affiliates, owners, successors and assigns shall have:

(A)     no successor or vicarious liabilities of any kind or character, whether pursuant to any theory of antitrust, environmental, successor or transferee liability, labor law, tax law, *de facto* merger or substantial continuity, or

otherwise, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing,

(B)     no liability for taxes on the Purchased Assets or relating to the operation of any of the Purchased Assets prior to the Closing, and

(C)     no liability for any bodily injury, death, property damage or other tort liability resulting from the Purchased Assets or the operation thereof prior to the Closing.

To the extent that the foregoing protections differ in any respect from the similar protections contained in the Sale Order, the broader of such protections shall prevail.

(v)     **Transfer Taxes.**   The deed delivered to BSL and all other instruments of transfer delivered pursuant to the APA shall be exempt from taxes as provided by Code Section 1146(a).

(vi)    **Post-Closing Sale Proceeds and Adjustments.**   If any Sale Proceeds are held back at the Closing to fund adjustments in accordance with the APA, or if any portion of the Sale Proceeds are payable after the Closing under the terms of the APA, then at such time as additional Sale Proceeds become due to the Debtors, such proceeds shall be remitted by wire transfer directly to the Bond Trustee.  If any funds are due to BSL pursuant to the adjustment provisions contained in section 11(i) of the APA, after taking into account any holdbacks set forth in the first sentence of this subparagraph, the Bond Trustee shall remit such amounts to BSL promptly upon final determination of such amounts.

(vii)   **Contingent Payment**.  BSL shall make the Contingent Payment directly to the Bond Trustee when due in accordance with the terms of the APA.  In the event and to the extent it becomes owed, BSL is authorized and directed to make the Contingent Payment to the Bond Trustee and as set forth in the APA.  The Debtors assign any and all rights to receive the Contingent Payment to the Bond Trustee, who shall have the exclusive right, in its own name, to enforce payment of the Contingent Payment (to the extent owed) pursuant to the provisions of the APA or otherwise.  The Bond Trustee shall pay 2.5% of the collected amount of the Contingent Payment to RBC as required by the RBC Agreement.

(b)     **Sale Prior to Effective Date.**  If the Closing occurs before the Effective Date:

12

(i)     **Closing Payments.**   Upon Closing, the Sale Proceeds will be distributed in accordance with the terms of the Sale Order.

(ii)    **Post-Closing Payments.**   Section 5.1(a)(vi) and (vii) shall (to the extent the obligations therein have not been fully performed prior to the Effective Date) apply.

(iii)   **Executory Contracts.**   Sections 9.1 and 9.2 shall be solely confirmatory in effect.

(iv)    **Funding of General Unsecured Fund.**   Notwithstanding any other provision of the Plan, on the Effective Date the General Unsecured Fund shall be funded by MHS, over and above the MHS Contribution, and not by funds of the Debtors' bankruptcy estates, *provided, however,* that if the General Unsecured Fund exceeds 50% the aggregate amount of Allowed General Unsecured Claims, such excess amount shall be refunded to MHS.   The payments made by MHS pursuant to this section shall not be treated as a credit under the Liquidity Support Agreement.

   **5.2     Bond Trustee and Operating Reserve Funds.**   To the extent not otherwise effectuated pursuant to a prior order of the Court, from and after the Effective Date, the Bond Trustee shall hold the funds in the Operating Reserve Fund, including funds deposited into the Operating Reserve Fund in connection with the Bond Trustee's right to receive the $250,000 in Expense Escrow Funds under the Expense Escrow Agreement regardless of whether the distribution of the such funds under the terms of Expense Escrow Agreement occurs prior to or after the Effective Date, free and clear of (a) any rights of the Debtors under the Loan Agreement, (b) any other claims of the Debtors, and (c) any claim, assertion or allegation of any party in interest in the Cases that the Operating Reserve Fund any longer is, property of the bankruptcy estate under Code Section 541 or subject to the automatic stay under Code Section 362.   As previously set forth in the Cash Collateral Orders, the Bond Trustee Funds are not property of the estate and such funds are held in trust for the benefit of the holders of the Bonds in accordance with the Loan Agreement.

   **5.3     Bank Accounts.**   To the extent not otherwise effectuated pursuant to a prior order of the Court, on the Effective Date, the Debtors shall turn over to the Bond Trustee all funds in the Debtors' bank accounts except the amount necessary to pay any outstanding checks and bank fees, subject to the terms of the Final Cash Collateral Order.

   **5.4     MHS Contribution.**  On the Effective Date, MHS shall, on account of (and not to exceed) the MHS Contribution, (a) remit to the Plan Trustee by wire transfer an amount equal to the Plan Trustee Required Amount, and (b) remit the balance, except for those amounts MHS is permitted to otherwise retain as credits under the terms of the Liquidity Support Agreement, by wire transfer to the Bond Trustee.   For the avoidance of doubt, such credits shall include the ICA Amount.

**5.5**     **Effective Date Payments of the Plan Trustee.**   On the Effective Date, upon receipt of the MHS Contribution, the Plan Trustee shall:

(a)     Notwithstanding Section 11.10, set aside the (i) General Unsecured Fund in a segregated account, which shall held solely for purposes of paying Allowed Class 4 Claims and Allowed Class 5 Claims in accordance with Section 7.2; and (ii) amounts estimated to become Allowed under Section 2.3 to the extent not previously paid; and

(b)     Pay such other amounts as the Plan or Confirmation Order requires him to pay on the Effective Date, subject to Section 7.4(a).

**5.6**     **Use of Cash Collateral.**  The Final Cash Collateral Order shall remain in effect from and after the entry of the Confirmation Order and through and including the Effective Date, subject to an agreed-to budget.   The Debtors may use proceeds of the Liquidity Support Agreement in accordance with the terms of the Final Cash Collateral Order or any other Order they might obtain and the Bond Trustee reserves all rights with respect to same.   The amount made available under Section 1.57(a) for Plan Expenses shall be reduced dollar-for-dollar by the amount actually disbursed by the Debtors through the Effective Date pursuant to the "Contingency" line item of the cash collateral budget approved by the Court on July 9, 2013, as such cash collateral budget may be extended by the Court.   Accordingly, for the avoidance of doubt, the total amount available for Plan Expenses shall be $200,000 (exclusive of retainers paid by the Debtors to Professional Persons prior to the Petition Date), less the adjustment required by the preceding sentence.

**5.7**     **Waiver of Avoidance Actions.**   Any and all actions belonging to the Debtors' estates pursuant to Chapter 5 of the Bankruptcy Code are waived.

**5.8**     **Cancellation of Bonds and Bond Documents.**  As of the Effective Date, the Bonds shall be cancelled without further action by any party, and the Bonds, the Loan Agreement, and any other documents related to the Bonds shall be deemed to continue in effect solely to the extent they relate to and are necessary to (i) allow applicable distributions pursuant to the Plan and the Loan Agreement, (ii) permit the Bond Trustee to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, and enforce its indemnity and other rights and protections with respect to and pursuant to the Loan Agreement and any other documents related to the Bonds, (iii) permit the Bond Trustee to set one or more record dates and distribution dates with respect to the distribution of funds to beneficial holders of the Bonds, (iv) permit the Bond Trustee to appear in the Cases with respect to matters relevant to the Bonds, (v) otherwise continue to govern relationships of the Bond Trustee and holders of the Bonds, and (vi) permit the Bond Trustee to perform any functions that are necessary in connection with the foregoing clauses (i) through (v).

**5.9**     **Preservation of  Bond Trustee's Rights.**  Section 5.8 (i) shall not in any way limit the rights of the Bond Trustee, for the benefit of the holders of the Bonds, to any further distribution from the Plan Trustee relating to the Bond Claim, (ii) shall have no effect on any liens granted to the Bond Trustee, and (iii) shall have no effect on the Bond Trustee's right to the Contingent Payment from MHS.

14

# SECTION 6
# PLAN TRUSTEE

**6.1    Appointment of Plan Trustee.**  Keith D. Lowey of Verdolino & Lowey, P.C. shall serve as Plan Trustee.  The Plan Trustee shall have the rights, powers and responsibilities set forth in the Plan.  The Plan Trustee shall act as an independent fiduciary in the interests of all entities having an interest in the Debtors' estates.  No bond or other security shall be required of the Plan Trustee except as may be expressly ordered by the Court.

**6.2    Successor Plan Trustee.**  If the Plan Trustee at any time resigns, is removed, dies, becomes incapable of action or is removed by Order entered after notice and hearing, a successor Plan Trustee shall be appointed pursuant to an Order entered after notice and a hearing.

**6.3    Plan Trustee's Powers.**  From and after the Effective Date, after the transfer of funds required by Section 5.4, the Plan Trustee shall assume full control of the Debtors and their assets.  The Plan Trustee shall have authority to litigate to final judgment, settle or withdraw objections to Claims filed by the Debtors and not resolved prior to the Effective Date.  The Plan Trustee shall have full power and authority to take all actions and execute all documents on behalf and in the name of the Debtors necessary or appropriate to administer such assets and otherwise to implement the Plan without the need for Court approval except as specifically required by the Plan.  The Plan Trustee shall carry out the Debtors' remaining obligations, if any, under the APA.  Without limiting the generality of the foregoing, the Plan Trustee shall have all powers that were vested in the board of directors of each Debtor prior to the Effective Date and, notwithstanding any provision of applicable nonbankruptcy law, shall not be required to seek any vote or assent of any party, or to seek an Order, for any action taken in administering the Debtors consistently with the Plan except that the Plan Trustee shall seek an Order where specifically required by the Plan.  Notwithstanding Code Section 1141(b), confirmation of the Plan shall not terminate the Debtors' bankruptcy estates; rather, all assets of the Debtors' estates shall remain in such estate to be administered by the Plan Trustee.  The Plan shall not be deemed to create a trust or any other legal entity for tax or any other purposes.

**6.4    Disposition of Assets.**  The Plan Trustee may dispose of assets, enter into compromises and take other actions that, if done by the Debtors before the Effective Date, would have required Court approval under Code Section 363 and/or Fed. R. Bankr. P. 9019 only upon written consent of the Bond Trustee or entry of an Order authorizing same pursuant to a motion served upon the Bond Trustee, *provided*, *however*, that the Plan Trustee shall have the authority, without Court approval, to dispose of assets or settle claims having a liquidation value of not more than $50,000.

**6.5    Funds.**  All funds in the hands of the Plan Trustee for more than one (1) day shall be invested in accordance with Code Section 345, except as otherwise ordered by the Court.  Any income earned on such funds shall not be allocated to individual Claims or to any fund such as the General Unsecured Fund.  Funds in the hands of the Plan Trustee shall be deemed to be in the custody of the Court.  Because such funds are *in custodia legis*, no entity may acquire any interest in such funds except by Order.  In no event shall any such funds be required to be used for any purpose other than (a) distributions to creditors (including the Bond Trustee) of the Debtors as expressly required under the Plan, or (b) payment of Plan Expenses.

**6.6     Records.**  Until the Case Closing Date, (a) the Plan Trustee or his agent shall maintain books and records containing a description of all property of each estate as well as an accounting of receipts and disbursements, and (b) the Plan Trustee shall preserve such records of the Debtors as are required by applicable law, or are necessary or useful to the Plan Trustee's administration.  The Plan Trustee may destroy any and all other records not included in the Purchased Assets.

**6.7     Compensation.**  The Plan Trustee shall be entitled to receive, as a Plan Expense, reasonable compensation for services (including services prior to the Effective Date in preparing to serve as Plan Trustee) at the Plan Trustee's customary hourly rates in effect when such services are rendered, and reimbursement of customary actual and necessary expenses.

**6.8     Retention of Professionals.**  From and after the Effective Date, the Plan Trustee may without need for an Order employ counsel and such other professionals and consultants as he may reasonably determine to be necessary to advise and assist him in the performance of his duties as Plan Trustee.  Subject to Section 6.9, each such professional shall be entitled to receive, as a Plan Expense, reasonable compensation for services at such professional's customary hourly rates in effect when such services are rendered and reimbursement of customary actual and necessary expenses.  No professional or employee of the Debtors shall be barred from providing services to the Plan Trustee and receiving compensation therefor by reason of having served as a professional or employee of the Debtors.

**6.9     Compensation Procedure.**  For services performed from and after the Effective Date, the Plan Trustee and professionals employed by him shall receive compensation and reimbursement of expenses by sending the Plan Trustee a reasonably detailed invoice therefor, which the Plan Trustee shall pay to the extent he determines that such charges are reasonable and the Bond Trustee has not objected to payment of such invoice within the periods set forth below. Any professional submitting an invoice to the Plan Trustee shall at the same time serve a copy on the Bond Trustee.  If the Bond Trustee objects to an invoice, within 15 days after having been served with a copy of the invoice, the Bond Trustee must serve a written objection upon the professional and the Plan Trustee, specifically identifying the basis for the objection and the particular time entries involved.   If the Plan Trustee makes or receives an objection to a particular invoice, he shall withhold payment of the portion objected to and promptly pay the remainder of the invoice.  If the Plan Trustee, the Bond Trustee and the professional are unable to resolve the objection by agreement, then the professional may seek determination of the objection by promptly filing with the Bankruptcy Court a motion to compel payment of the disputed amount.  Except as provided by the preceding sentence, Court approval for professional fees constituting Plan Expenses shall not be required.  The requirements of the Bankruptcy Code and any national or local rules shall not apply.

**6.10     Limitation on Plan Expenses.**  Notwithstanding anything to the contrary contained herein, the Plan Trustee shall not be liable for, nor shall assets held by the Plan Trustee be subject to, (a) any liability arising after the Effective Date other than a Plan Expense, or (b) any Plan Expense, other than for compensation and reimbursement of a professional employed by the Plan Trustee, for which the Plan Trustee does not receive an invoice or other form of written notice within sixty (60) days after the incurrence of such alleged Plan Expense.

**6.11    Limitation of Liability.**  The Plan Trustee shall have no liability for any act or omission other than gross negligence or willful misconduct.  Without limiting the generality of the foregoing, the Plan Trustee may rely and shall be fully protected in acting upon any resolution, statement, certificate, instrument, report, notice, request, consent, order or other document which, in the absence of gross negligence or willful misconduct, the Plan Trustee believes to be genuine and to have been signed or (in the case of cables, telecopies, electronic mail transmittals, and the like) to have been sent by the proper party.

**6.12    Disputes.**  The Court shall have exclusive jurisdiction over any dispute arising from any act or omission of the Plan Trustee.  Whether or not a dispute has arisen, the Plan Trustee shall have the right at any time to seek instructions from the Court concerning any question arising in connection with the performance of the Plan Trustee's duties hereunder, upon notice to the Bond Trustee.

**6.13    Closing of Case/Interim Reports.**  Upon the disposition by Final Order of all objections to Claims, disposition of all assets held by the Plan Trustee and the completion of all distributions by the Plan Trustee, the Plan Trustee shall promptly prepare and file with the Court all documents, and shall take all other steps, necessary to close the Cases.  Before filing such documents, the Plan Trustee and any professional persons engaged by him shall be paid their final invoices (which in the case of the Plan Trustee, shall include advance payment for preparing final tax returns for the Debtors and advance reimbursement for his cost of document destruction as provided in Section 6.14, subject to the compensation procedures set forth in Section 6.9) and shall refund to the Plan Trustee any unused retainer amounts.  Thereupon, all funds remaining in the hands of the Plan Trustee shall be remitted to the Bond Trustee by wire transfer.  The Plan Trustee shall file such reports as may be required by the Federal Rules of Bankruptcy Procedure and/or MLBR 3022-1.

**6.14    Final Decree.**  Following (and notwithstanding) entry of a final decree closing the Cases:

(a)    The Plan Trustee shall file a certified copy of the final decree with the Massachusetts secretary of state, whereupon the Debtors shall, notwithstanding requirements of applicable law, be deemed legally dissolved, and the Massachusetts secretary of state shall accept such final decree for filing and as conclusive evidence of the dissolution of the Debtors;

(b)    The Plan Trustee shall be authorized to, and shall, prepare and file final state and federal income tax returns for the Debtors, and the final report required by Section 11.9; and

(c)    The Plan Trustee may at any time, notwithstanding any requirements of applicable law concerning preservation of records, destroy all records of the Debtors and their bankruptcy estates.

17

## SECTION 7
## CLAIMS AND DISTRIBUTIONS

**7.1    Bond Claims.**  A Bond Claim in the amount of $88,340,000 shall be deemed Allowed in favor of the Bond Trustee on the Effective Date.  Solely for administrative convenience and to avoid duplication, all other Bond Claims shall be deemed Disallowed without need for entry of any Order, *provided, however,* that the rights of holders of Bonds under the Loan Agreement, including the right to receive distributions from the Bond Trustee as provided therein, are hereby expressly preserved.

**7.2    General Unsecured Fund.**  The Plan Trustee shall administer the General Unsecured Fund for the benefit of holders of General Unsecured Claims (*i.e.*, the aggregate of Class 4 and Class 5).  From the General Unsecured Fund, the Plan Trustee shall distribute in Cash to the holder of each Allowed General Unsecured Claim its Pro Rata Share of the General Unsecured Fund.  Such distributions shall be made as follows:

(a)    **Ratable Distributions.**  The Plan Trustee (i) shall, on the Effective Date, make a Cash payment on account of each Allowed General Unsecured Claim in the amount of its Pro Rata Share of the General Unsecured Fund, and (ii) if any General Unsecured Claim was Unresolved as of the time of such distribution, (A) shall, at such time as all General Unsecured Claims are Resolved, make a final distribution in Cash on account of each Allowed General Unsecured Claim such that the holder thereof shall have received distributions of the General Unsecured Fund equal to such holder's Pro Rata Share thereof, and (B) may prior thereto, in his sole discretion, make one or more interim distributions in Cash on account of each Allowed General Unsecured Claim such that the holder thereof shall have received distributions of the General Unsecured Fund equal to such holder's Pro Rata Share thereof as computed by the Plan Trustee at the time of such interim distribution.

(b)    **Residual Amount.**  In the event the General Unsecured Fund contains a surplus over and above the amount required to pay all Allowed and Unresolved General Unsecured Claims in an amount equal to 50% of such Claims, the Plan Trustee shall remit to MHS by wire transfer such surplus amount.

**7.3    Postpetition Claims.**  Any Administrative Claim still outstanding as of the Postpetition Bar Date shall be forever barred unless it is the subject of a proof of claim (or, as provided in Section 2.3, an application) filed with the Court on or before the Postpetition Bar Date.

**7.4    Disputed Claims.**

(a)    **No Payment before Allowance.**  Notwithstanding anything to the contrary contained herein, but subject to Section 2.3, no payment shall be made on account of any Claim until it is Allowed.  If a Claim is Allowed

after the date when a distribution under the Plan on account of such Claim would have been payable but for this Section 7.4(a), such distribution shall be made not later than ten Business Days after such Claim is Allowed.

(b)     **Standing to Object.**   After the Effective Date, the Plan Trustee shall be the sole party in interest with standing to object to Claims, *provided, however,* that BSL shall have standing with respect to determining Cure Costs and shall be the only entity with standing to object to Cure Costs if the asserted Cure Costs are less than $100,000 in the aggregate or BSL has waived the Purchase Price adjustment under Section 1(m)(i) of the APA.

(c)     **Objection Deadline.**   The Plan Trustee shall file objections to Claims not later than the Objection Deadline therefor.

(i)     **Shortening of Objection Deadline.**   Upon determining in his sole discretion that no grounds exist to object to a particular Claim, the Plan Trustee may make payment on account of a Claim prior to the Objection Deadline, and upon making such payment the Objection Deadline as to such Claim shall be deemed shortened to the date such payment is made.

(ii)    **Extension of Objection Deadline.**   Upon motion of the Plan Trustee seeking an extension of the Objection Deadline as to any Claim or group of Claims, such deadline shall (a) automatically be extended through and including the fifth Business Day after the Court enters an Order on such motion, and (b) be further extended as may be provided in such Order.

(d)     **Reserve for Disputed Claims.**   The Plan Trustee shall hold in reserve the amount of any distribution that would be required under the Plan on account of a Claim but for the fact that such Claim is not an Allowed Claim.

**7.5     No Interest.**   Except as expressly stated in this Plan, no interest, penalty or late charge is allowed on any Claim or Interest after the Petition Date.

**7.6     Preservation of Recoupment and Setoff.**   No provision of this Plan, including but not limited to Sections 5.8 and 8.5, shall be deemed to waive the Debtors' rights of recoupment and setoff in respect of each and every Claim.

**7.7     Delivery of Distributions.**   Except as otherwise agreed by the Plan Trustee or as set forth in the Plan, distributions to holders of Allowed Claims shall be made by check sent by first class mail with postage prepaid to each such holder at the address set forth in the proof of claim for such Allowed Claim or, if none, the address set forth in the Schedules, *provided* that if the Plan Trustee receives notice in writing of a change of address for any such holder or a transfer of a Claim by a holder, the Plan Trustee shall thereafter remit distributions to the new address or transferee set forth on such notice, as the case may be.  All checks shall be deposited in the mail not later than ten (10) days after the date of the check.

**7.8**     **Time Bar to Cash Payments.**     If any distribution on account of a Claim is returned to the Plan Trustee as undeliverable or on notice from the holder of the Claim of a different address to which such distribution should be sent, or if a check in payment of the distribution on account of a Claim remains uncashed ninety (90) days after the date of such check, then the check will be voided, *provided*, *however*, that the Plan Trustee shall reissue such distribution if he receives, prior to the commencement of final distributions under the Plan, written notice from the holder of such Claim of a different address to which distributions should be sent.  If the Plan Trustee does not receive any such notice prior to the date on which no General Unsecured Claim remains Unresolved, then (a) such holder shall be entitled to no further distributions on account of such Claim and, notwithstanding Section 1.3 of the Plan, such Claim shall be treated as Disallowed for purposes of computing distributions; and (b) the amount of the uncashed distributions to such holder shall become available for distribution (i) on account of other General Unsecured Claims pursuant to Section 7.2(b), or (ii) to MHS, pursuant to Section 7.2(b) (provided, however, that such amounts shall be paid to the Bond Trustee in the event that the General Unsecured Fund was funded pursuant to the Plan Trustee Required Amount).

**7.9**     **Certainty of Estate Obligations.**     In order to provide certainty as to the obligations of the Plan Trustee:

(a)     **Late-Filed or Informal Claims.**  Each Claim as to which a proof of claim was required to be filed on or before the Bar Date and as to which a proof of claim was not filed on or before the Bar Date shall not under any circumstances become an Allowed Claim.  A proof of claim that has not been timely filed shall be of no force or effect whatsoever, including for purposes of any distribution made by the Plan Trustee; nor shall any action (including giving notice to the Debtors or otherwise making an "informal" proof of claim) serve for purposes of the Plan and distributions required of the Plan Trustee as a substitute for timely filing a proof of claim.

(b)     **Amendment of Claims.**  In no event shall the Allowed Amount of any Claim exceed the amount set forth in a required proof of claim therefor filed on or before the Bar Date except to the extent that (i) the claimant, not later than one Business Day before the Effective Date, files with the Court and serves on the Debtors so as to be received by Debtors' counsel on the same day, an amended proof of claim, and (ii) such amendment is not otherwise barred by law or by Order.

(c)     **Reconsideration.**  No Order allowing or disallowing a Claim may be reconsidered, pursuant to Code Section 502(j) or otherwise, so as to increase the Allowed Amount thereof after the later of (i) one Business day before the Effective Date, or (ii) fourteen (14) days after the date an Order allowing such Claim is first entered.

(d)     **Unknown Claims.**  Notwithstanding anything to the contrary contained in the Plan, if a Claim is filed with the Court by the Bar Date or the Postpetition Bar Date, as applicable, but the proof of claim is not correctly maintained in the Court's records or otherwise does not come to the

attention of the Plan Trustee, acting in good faith, in reviewing or making payment on account of Claims, or if the Court for any reason determines the Bar Date or Postpetition Bar Date to be inapplicable to a particular Claim filed or asserted thereafter, payment thereon shall be made as required by the Plan only to the extent possible without (a) impairing payment of then-existing or later incurred Plan Expenses, or (b) requiring disgorgement of any payment or distribution previously made by the Plan Trustee.

**7.10    Insured Claims.**  Notwithstanding anything to the contrary contained in the Plan, solely for the purpose of computing distributions on account of a Claim (other than the Bond Claims) covered in whole or in part by insurance of the Debtors, (a) the Allowed Amount of such Claim shall be reduced by the amount of insurance therefor, and (b) in the case of an Unresolved Claim that, when Allowed, will be wholly covered by such insurance, the Allowed Amount of such Claim shall be zero.

**7.11    Allowed Amount Binding.**  The determination pursuant to Section 1.3 and 1.32 whether a Claim is Allowed or Disallowed, and if Allowed then in what amount, shall bind the holder of such Claim not only as to the Allowed Amount against the Debtors' estates but also as to the liability of any other person or entity that is, or is asserted to be, liable for such claim. There shall not be recovered on account of any Claim, including the liability of any other person therefor whether denominated secondary, primary or independent, an aggregate amount (including distributions under the Plan) in excess of the Allowed Amount of such Claim.

## SECTION 8
## RELEASES AND EXCULPATION

**8.1    Compliance with Plan.**  Notwithstanding any provision of this Section 8, the Debtors and all parties in interest shall be required to comply with the Plan and the APA in all respects, and no party in interest shall be deemed to have relinquished any right to enforce the Plan against the Debtors and the Plan Trustee in accordance with its terms.

**8.2    Exculpation.**  Neither the Debtors (subject to Section 8.1), the members of the Creditors' Committee, the Bond Trustee, MHS, the Exhibit B Bondholders, nor any of their current or former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of the APA, the Plan, the disclosure statement therefor, or the pursuit of confirmation of the Plan, except for willful misconduct or gross negligence.

**8.3    Releases by the Debtors and Their Estates**.  Effective upon the occurrence of the Effective Date, the Debtors shall, on their own behalf and on behalf of their respective bankruptcy estates, be deemed to forever release and discharge the Released Parties of and from any and all claims, demands, causes of action and the like, arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed,

known or unknown, foreseen or unforeseen, at law, in equity or otherwise; provided, however, nothing in this Section 8.3 shall release or discharge BSL from its obligation to make the Contingent Payment set forth in Section 5.1(a)(vii) hereof.

**8.4    Consensual Releases by Holders of Claims.**    Each entity that votes to accept this Plan shall be deemed to forever release and discharge the Released Parties of and from any and all claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise that is based on, relates to, or in any manner arises from, in whole or in part, the Debtors, the Debtors' prepetition and postpetition restructuring efforts, the Cases, negotiation and preparation of the Plan or any related document, confirmation of the Plan, implementation of the Plan or any related document, the purchase or sale (or rescission of the purchase or sale) of any security of the Debtors (including the Bonds), the transactions or occurrences giving rise to any Claim or Interest of the releasing entity, or any business or contractual arrangements between such entity and the Debtors; provided, however, that nothing contained in this section 8.4 shall prevent the Bond Trustee from enforcing obligations of MHS under the liquidity support agreement.    Notwithstanding the foregoing, (a) in the event that this Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby, and (b) this Section 8.4 shall not apply to any entity that, on its ballot accepting the Plan, checks the box next to the words: "The entity submitting this ballot elects not to give or receive a release pursuant to Section 8.4 and 8.5 of the Plan," and (c) this Section 8.4 shall not apply to the Bond Trustee's right to receive the Contingent Payment set forth in Section 5.1(a)(vii) hereof either directly from BSL or through the Debtors.

**8.5    Reciprocal Release by Debtors.**    Each entity that is deemed to release the Released Parties pursuant to Section 8.4 shall be deemed released by the Debtors such that, effective upon occurrence of the Effective Date, the Debtors shall be deemed to forever release and discharge such entity and all current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise.    For the avoidance of doubt: (i) the Debtors are not authorized and shall not be deemed to release any claim constituting a part of the Purchased Assets; and (ii) nothing in this Section 8.5 shall impair the Bond Trustee's right to receive the Contingent Payment set forth in Section 5.1(a)(7) hereof.

## SECTION 9
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1    Residency Agreements.**    As of the Closing, all Residency Agreements shall be deemed assumed by the Debtors and assigned to BSL.    The amendments to Residency Agreements executed by Residents subject to the condition that BSL acquire the Facility shall

take effect and be binding upon BSL and the signatory Residents from and after the Closing. BSL shall honor all obligations of the Debtors to the Residents from and after the Closing. Pursuant to Code Section 365(k), the Debtors shall have no obligations or liability under any Residency Agreements from and after the Closing.

**9.2      Assumed Contracts.**  As of the Closing, all contracts assumed by BSL shall be deemed assumed by the Debtors and assigned to BSL.  Pursuant to Code Section 365(k), the Debtors shall have no obligations or liability under such contracts from and after the Closing.  At the Closing, BSL shall pay all Cure Costs as determined by the Court in accordance with the Order (a) Approving Bid Procedures, (b) Approving Expense Reimbursement, (c) Scheduling Hearing to Consider Sale of Substantially All of Debtors' Assets Free and Clear of Liens and Other Interests, (d) Approving the Form and Manner of Notice Thereof, and (e) Granting Related Relief entered April 18, 2013 [Docket No. 136].

**9.3      Rejection of Remaining Contracts.**  All executory contracts and unexpired leases of the Debtors as of the Petition Date not assumed by BSL shall be deemed rejected on the Effective Date.

**9.4      Rejection Damage Claims.**  If the rejection of an executory contract or unexpired lease by the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be Disallowed except to the extent set forth in a proof of claim therefor filed with the Court on or before the Bar Date.

### SECTION 10
### CONDITIONS TO EFFECTIVE DATE

**10.1**    The following are conditions to the Effective Date of the Plan:

(a)      The Confirmation Order shall have been entered, and shall be in full and effect, not having been stayed;

(b)      The Confirmation Order shall have been entered in the form proposed by the Debtors and approved by the Bond Trustee, the Creditors' Committee and MHS, such approvals not to be unreasonably withheld; and

(c)      The Closing shall have been completed, including receipt of Sale Proceeds.

### SECTION 11
### MISCELLANEOUS PROVISIONS

**11.1    Effect of Plan.**  The provisions of the Plan shall bind all holders of Claims and Interests, whether or not they accept the Plan, and any successors and assigns to such holders of Claims and Interests.  Entry of the Confirmation Order shall be deemed to be a determination by the Court only as to the matters expressly set forth therein and not as to any other matter involving the Debtors, their estates and any party-in-interest in the Cases.  All causes of action of the Debtors' estates are preserved except as expressly provided herein.  No action or omission in relation to the Plan (including but not limited to solicitation of acceptances of the Plan,

statements contained in or omitted from the disclosure statement therefor, entry of the Confirmation Order or occurrence of the Effective Date) shall serve to bar, whether by *res judicata*, collateral estoppel, judicial estoppel or otherwise, the prosecution of any action or objection by or on behalf of the Plan Trustee.

**11.2    Cramdown.**  If no ballot is timely received for a particular class either accepting or rejecting the Plan, such class shall be deemed to have accepted the Plan.  As for any class that votes pursuant to Code Section 1126(c) not to accept the Plan or is deemed pursuant to Code Section 1126(g) not to accept the Plan, the Plan shall be deemed to have met the requirements for confirmation of the Plan, including the requirements of Code Section 1129(b), except to the extent stated with specificity in an objection to the Plan timely filed by a member of such class. The Debtors are deemed to have reserved their right to seek confirmation of the Plan under Code Section 1129(b) as to any class that votes pursuant to Code Section 1126(c) not to accept the Plan or is deemed pursuant to Code Section 1126(g) not to accept the Plan.

**11.3    Discharge; Dissolution.**  The Plan is a plan of the type described in Code Section 1141(d)(3) and, accordingly, the Debtors shall not receive a discharge.  Disallowed Claims, although not discharged, shall not be entitled to receive any distribution under the Plan or to receive or retain any assets of or owed to the Debtors' estates, whether by way of setoff, recoupment, attachment, levy or otherwise.  As provided in Code Section 362(c)(2)(A), the automatic stay shall remain in effect as to the Debtors and all assets of the Debtors' bankruptcy estates, including all assets in the hands of the Plan Trustee, until the Case Closing Date.  As of the Case Closing Date, the Debtors shall be deemed dissolved.

**11.4    Withdrawal, Amendment or Modification of Plan.**  The Debtors may (i) revoke and withdraw the Plan, or propose amendments to or modifications of the Plan under Code Section 1127, at any time prior to entry of the Confirmation Order; and (ii) after entry of the Confirmation Order, modify the Plan under Code Section 1127 and remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of holders of Claims and Interests are not materially and adversely affected.

**11.5    Effect of Non-Consummation.**  If the Plan is withdrawn or revoked, or if confirmation of the Plan is denied by Final Order, or if for any other reason the Effective Date does not occur, the Plan shall be null and void.  In such event, the provisions of the Plan may not be used against the Debtors, the Bond Trustee or any creditor that accepted the Plan, for any purpose whatsoever.  Without limiting the generality of the foregoing, the Plan shall be deemed an offer of settlement to all parties in interest, and acceptance of the Plan shall be deemed acceptance of such offer, such that Rule 408 of the Federal Rules of Evidence and any similar provisions of state law shall apply.

**11.6    Severability.**  To the extent that any provision of the Plan would, by its inclusion in the Plan, preclude the Court from entering the Confirmation Order, the Debtors may modify or remove such provision without further notice.  Except as set forth in the preceding sentence, the Plan shall be construed as a single integrated agreement, and the Debtors, their creditors and any other parties-in-interest shall be conclusively presumed to have relied on all provisions of the

Plan and the Confirmation Order for purposes of any future determination of the enforceability thereof.

**11.7   Effective Date; Substantial Consummation.**   The Effective Date shall occur whether or not the Confirmation Order has become a Final Order.  For purposes of Code Section 1101(2), the Plan shall be deemed to have been substantially consummated once the Sale Proceeds have been distributed in accordance with Section 5.1(a).

**11.8   Debtors.**   Upon the Plan Trustee's assumption of authority and control of the Debtors and their assets on the Effective Date pursuant to Section 6.3 of the Plan, the Debtors' members, directors and officers shall have no further responsibilities in respect of the Debtors or the Cases, and shall be deemed discharged as directors and officers, *provided*, *however*, that each former director or officer of either Debtors shall execute any document reasonably requested by the Plan Trustee on or after the Effective Date to evidence such assumption of authority and control.

**11.9   Post-Confirmation Fees and Reports.**   The Plan Trustee will be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) through the Case Closing Date.  After entry of the Confirmation Order, the Plan Trustee will serve the United States Trustee (Region 1) with a quarterly report for each fiscal quarter (or portion thereof) that the Cases remain open.  The quarterly financial report shall include the following:

> (a)   a statement of all disbursements made during the course of the fiscal quarter, whether or not pursuant to the Plan;

> (b)   a summary, by class, of amounts distributed or property transferred to each recipient under the Plan, and an explanation of the failure to make any distributions or transfers of property under the Plan;

> (c)   the Plan Trustee's projections as to its continuing ability to comply with the terms of the Plan;

> (d)   a description of any other factors that may materially affect the Plan Trustee's ability to comply with the terms of the Plan; and

> (e)   an estimated date when the Plan Trustee will seek a final decree, unless already done.

**11.10   Dates.**   Whenever the Plan specifies a date for the Plan Trustee to make any disbursement or take any other action, such action shall be taken on such date or as soon as practicable thereafter, except as required by Section 5.5(a).

**11.11   Headings.**   Headings are utilized in the Plan for convenience only and shall not constitute a part of the Plan for any other purpose.

**11.12   Construction.**   The rules of construction set forth in Code Section 102 shall apply to construction of the Plan.

**11.13  Retained Jurisdiction.**  The Court shall retain jurisdiction over the Cases after the entry of the Confirmation Order for the following purposes:

(a)  to consider and approve any modification of the Plan under Code Section 1127 and any modification of the Confirmation Order, subject to the terms contained herein;

(b)  to hear and determine all disputed Claims not resolved by the Effective Date and all applications filed by Professional Persons seeking compensation and reimbursement of expenses from the Debtors' estates for services rendered prior to the Effective Date;

(c)  to hear and determine all adversary proceedings, contested matters, or other actions commenced or continued by the Debtors or the Plan Trustee;

(d)  to hear and determine any disputes arising under the Plan, the Confirmation Order or under any agreements or instruments regarding implementation of the Plan;

(e)  to grant extensions of any deadlines set forth in the Plan or the Confirmation Order as may be appropriate; and

(f)  to make such Orders as are necessary and appropriate to carry out and implement the provisions of the Plan.

Dated this 9th day of July, 2013.

Respectfully submitted,

THE GROVES IN LINCOLN, INC. and THE APARTMENTS AT THE GROVES, INC.,

By their attorneys,

/s/ Daniel C. Cohn
Daniel C. Cohn, Esq. BBO #090780
Ryan M. MacDonald, Esq. BBO #654688
Murtha Cullina LLP
99 High Street, 20th Floor
Boston, MA  02110
(617) 457-4000 Telephone
(617) 482-3868 Facsimile
dcohn@murthalaw.com
rmacdonald@murthalaw.com