UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| In re | ) | |
| | ) | CHAPTER 11 |
| THE GROVES IN LINCOLN, INC., *et al.*, | ) | CASE NO. 13-11329-HJB |
| | ) | |
| Debtors.[1] | ) | (*Jointly Administered*) |
| | ) | |

**DISCLOSURE STATEMENT WITH RESPECT TO DEBTORS'
SECOND AMENDED CHAPTER 11 PLAN DATED JULY 9, 2013**

## I.   INTRODUCTION

The Groves in Lincoln, Inc. ("Groves") and its wholly-owned subsidiary, The Apartments at The Groves, Inc. ("Apartments"), provide this Disclosure Statement to all of their known creditors in order to supply the information you will need in exercising your right to vote upon the Debtors' Second Amended Chapter 11 Plan dated July 9, 2013 (the "Plan").[2] A copy of the Plan is attached to this Disclosure Statement as Exhibit 1. All terms defined in the Plan have the same meaning in this Disclosure Statement unless otherwise noted.

Groves and Apartments (collectively, the "Debtors") are Massachusetts not-for-profit corporations that own and operate a senior living facility in Lincoln, Massachusetts known as The Groves in Lincoln ("The Groves"). The Debtors each filed a petition under Chapter 11 of the United States Bankruptcy Code on March 11, 2013, for the announced purpose of selling their assets to BSL Lincoln, LLC ("BSL") under an Asset Purchase Agreement between the Debtors and BSL dated February 8, 2013 (the "APA"), or to such other purchaser or sponsor of a debt restructuring as submits the highest or best offer for the assets or sponsorship of the Debtor, as determined by the Court as a result of a competitive bidding process (the "Sale"). To accomplish that Sale, on March 11, 2013, the Debtors filed their Sale Motion,[3] and on April 18, 2013, the Court entered its Bid Procedures Order[4] specifying the process for the Debtors and the

---

[1] The debtors in these jointly administered chapter 11 cases, along with the last four digits of each debtors' federal tax identification number, are: The Groves in Lincoln, Inc. f/k/a The Groves in Lincoln - Deaconess, Inc. (0778), and The Apartments at The Groves, Inc. f/k/a The Groves Apartments – Deaconess, Inc. (0696). The mailing address for The Groves is: One Harvest Circle, Lincoln, MA 01773.

[2] This Disclosure Statement is also being supplied, as a matter of information, to creditors not entitled to vote, and to all persons that have requested notices in this Chapter 11 case.

[3] Motion to (a) Authorize Sale of Substantially All of their Assets Free and Clear of All Liens and Other Interests, (b) Authorize Assumption and Assignment of Certain Contracts and Leases in Connection Therewith, (c) to Approve Sale Procedures Therefor, and (d) for Other Related Relief [Docket No. 12].

[4] Order (A) Approving Bid Procedures; (B) Approving Expense Reimbursement, (C) Scheduling Hearing on Motion filed by Debtor The Groves in Lincoln, Inc. to Sell Substantially All of Their Assets Free and Clear of Liens

Court to consider competitive bids.  The Debtors did not receive any higher or better offers for the assets on or before the June 3, 2013 deadline for submitting such bids.  The Court on June 12, 2013 entered its order approving the Sale.  The Sale was successfully closed on June 28, 2013. The Plan is designed to accomplish the distributions to creditors made possible by the Sale proceeds, and to wrap up the Debtors' affairs in an orderly way.

A ballot for your use in voting to accept or reject the Plan is enclosed.  Instructions for completing and returning the Ballot are printed on the Ballot itself.  ***In order for your vote to count, the original signed ballot (or in the case of bondholders whose Bonds are held in "street name," a master ballot completed by the record holder of the Bonds as explained in Section XIV(B) below) must be received by Debtors' counsel at the address stated on the ballot no later than 4:30 p.m., Eastern Daylight Time, on August __, 2013.***

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. HOWEVER, EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED ON INFORMATION SUPPLIED BY THE DEBTORS.  WHILE THE DEBTORS HAVE DONE THEIR BEST TO ASSURE THAT THE INFORMATION IS CORRECT AND COMPLETE, IT IS IMPOSSIBLE TO REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT ERROR.

No representations concerning the Debtors or the Plan are authorized other than as set forth in this Disclosure Statement.  Although this Disclosure Statement describes the Plan in summary and in detail, it is recommended that you review the Plan itself for a definitive understanding of its terms.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS RECOMMEND THAT ALL CREDITORS, INCLUDING THE DEBTORS' SUPPLIERS AS WELL AS BONDHOLDERS, VOTE TO ACCEPT THE PLAN.**

## II.    <u>SUMMARY OF THE PLAN</u>

The Plan provides that subject to paying the expenses of the Chapter 11 case, all proceeds from the Sale – together with funds held by the Debtors and by Wells Fargo, N.A., as trustee for the Debtors' bondholders (the "Bond Trustee") – will be paid to the Debtors' creditors, the majority of which are bondholders.  The Closing of the Sale took place on June 28, 2013.

Payments to bondholders will be made by the Bond Trustee.  Funds were wired to the Bond Trustee and paid to the Debtors' other secured creditors directly from the Closing. Payments to other creditors will be made by a Plan Trustee appointed to administer the Plan for their benefit and to wrap up the Debtors' affairs.  Unless you hold a disputed claim, in which case payment must await the Bankruptcy Court's determination of how much you are owed, payments will be made on the same day as, or as soon as practicable after, the Effective Date.

---

and Other Interests; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief (the "Bid Procedures Order") [Docket No. 136].

Distributions are projected to be as follows:

- If you are a bondholder, the funds wired to or retained by the Bond Trustee are projected to yield approximately 48% to 63% (based upon the series of Bonds owned) in the event the Contingent Payment is made by BSL in the maximum amount provided by the APA, and 44% to 57% (based upon the series of Bonds owned) in the event the Contingent Payment is not made.

- If you hold an administrative claim or other type of priority claim, or a secured claim other than Bonds, you will be paid the full amount you are owed.

- General unsecured claims will receive a *pro rata* share of the General Unsecured Fund. The General Unsecured Fund will be funded in an amount equal to 50% of the total amount of Allowed General Unsecured Claims, but not in an amount greater than $32,500. The Debtors forecast that the Allowed General Unsecured Claims will total approximately $68,000. If the forecast is correct, holders of Allowed General Unsecured Claims will be paid 48% of the Allowed Amount of their Claims. However, the inherent difficulties of forecasting Allowed Claims in any bankruptcy case mean that creditors should not rely on this forecast. Holders of General Unsecured Claims will not receive any interest on account of their Allowed Claims.

BSL, the buyer of The Groves senior living facility and other assets of the Debtors under the APA, is an affiliate of Benchmark Senior Living LLC ("Benchmark").[5] Benchmark is a well-known owner and operator of senior living facilities. BSL emerged from the extensive pre-bankruptcy marketing process with the highest and best offer. Not only did BSL's offer propose the greatest cash consideration to creditors but it also committed to honor the Debtors' obligations to residents of The Groves, subject to consensual amendments with over 90% of the residents. The APA provides for BSL to pay $30 million at the Closing (the "Purchase Price"), which (as adjusted pursuant to the APA) the Debtors have received and remitted to the Bond Trustee, and up to an additional $5 million if and when approvals for construction of an assisted living and dementia care facility on the campus of The Groves are obtained.

The Debtors believe that the Purchase Price represents the full value of The Groves in today's marketplace and that distribution of the Sale proceeds under the Plan provides the maximum value that would be available for creditors of Debtors under any probable scenario. For this reason, the Debtors urge all creditors to vote to accept the Plan.

---

[5] At the Closing, title to the Purchased Assets was conveyed to certain designees of BSL.

III.  **DESCRIPTION OF THE DEBTORS**

A.  **Debtors' Business and Corporate Structure**

Groves is a Massachusetts not-for-profit corporation organized in 2006 for the purpose of establishing, developing and operating an independent senior living facility in Lincoln, Massachusetts, known as The Groves in Lincoln.  Groves has two members, Masonic Health System of Massachusetts, Inc. ("MHS") and New England Deaconess Association - Abundant Life Communities, Inc. ("Deaconess").  On October 8, 2009, MHS and Deaconess entered into Members Agreement providing MHS with an 80% and Deaconess a 20% membership interest in Groves (the "Members Agreement").

At the time Groves was organized in 2006, Deaconess was its sole member.  In 2007, Deaconess began the development and construction of The Groves but soon discovered that it did not have sufficient funding to complete the construction.  Deaconess entered into negotiations with MHS for MHS to provide sufficient financing for Groves to obtain the construction and permanent financing required to finish construction of The Groves.  These negotiations resulted in execution of the Members Agreement between MHS and Deaconess.

Apartments is a Massachusetts not-for-profit corporation organized in 2007 for the purpose of developing and maintaining senior living facilities.  Consistent with this purpose, on November 1, 2007, Apartments entered into a Ground Lease with Groves, pursuant to which Apartments leased a certain three-acre parcel located at The Groves to operate the 30-unit rental building located on that parcel (the "Rental Units") for an initial term ending on December 31, 2044 (the "Ground Lease").  Groves is the sole member of Apartments.

B.  **Financing**

In November 2009, Groves obtained financing to complete The Groves through the issuance of $117,265,000 in bonds by the Massachusetts Development Finance Agency (the "Issuer") including (a) $41,940,000 Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009A, (b) $34,750,000 Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009B-1 Tax Exempt Mandatory Paydown Securities (TEMPS-85$^{SM}$), and (c) $40,575,000 Senior Living Facility Revenue Bonds (The Groves in Lincoln Issue), Series 2009B-2 Tax Exempt Mandatory Paydown Securities (TEMPS-50$^{SM}$) (collectively, the "Bonds").  The Issuer agreed to lend the proceeds of and Groves agreed to repay the Bonds pursuant to the terms of a Mortgage, Security, Loan and Trust Agreement dated as of November 1, 2009, as amended, between the Issuer, the Bond Trustee, and Groves (the "Loan Agreement").  Groves's obligation to repay the principal of and interest on the Bonds to the Bond Trustee is secured by the Loan Agreement, which grants the Bond Trustee a first priority lien on the real estate, equipment and other assets comprising The Groves and on Groves's gross revenues derived from the ownership and operation of The Groves (collectively the "Collateral").  Collateral also includes, among other things, various funds held by the Bond Trustee or Groves.  In addition, the Bond Trustee has a first priority lien against the Ground Lease, along with any rents payable to Groves, pursuant to the terms of an Assignment of Leases and Rents dated November 1, 2009.

Finally, for the purpose of providing Groves with additional liquidity, MHS entered into a certain Liquidity Support Agreement with the Bond Trustee and Groves dated November 1, 2009 (as amended, the "LSA").  Under the terms of the LSA, MHS agreed to provide up to $5,000,000 to Groves if no other funds were available, to enable Groves to fund operating expenses of Groves, including debt service on the Bonds.  As of the Petition Date, the aggregate outstanding undrawn amount under the LSA was $2,583,732.

### C.    The Groves Facility

The Groves is located on a 34-acre site located in Lincoln, Massachusetts.  This senior living facility consists of 168 independent living units, inclusive of the Rental Units, with a mix of apartments and cottages.  Common areas include a main community center, dining rooms, lounges, a barbershop/beauty salon, a library, fitness center and pool.  The Groves is managed by MHS pursuant to a Management Agreement between Groves and MHS dated November 1, 2009.  As of the Petition Date, Groves had 26 full-time and 22 part-time employees.

### D.    Residency Agreements

Residents of The Groves must be a least 62 years of age at the time they occupy an independent living unit.  The terms and conditions of their residency are governed by a residency agreement.   The Groves uses four forms of residency agreements: (i) a 90% Refundable Residency Agreement; (ii) a 50% Refundable Residency Agreement; (iii) a 0% Refundable Residency Agreement; and (iv) a Rental Agreement for the Rental Units (collectively, the "Residency Agreements").  The Residency Agreements require residents to pay two types of fees: (i) an entrance fee paid prior to moving into an independent living unit (the "Entrance Fee") or, in the case of a Rental Unit, a security deposit (a "Security Deposit"); and (ii) a monthly service fee.  The Entrance Fee consists of (i) a deposit equal to the lesser of $35,000 or 10% of the Entrance Fee that is due upon the execution of the Residency Agreement and selection of independent living unit (the "Entrance Fee Deposit"); and (ii) the remaining 90% of the Entrance Fee which is due when the resident takes occupancy (the "Occupancy Payment").  Depending on the size and type of the independent living unit, Entrance Fees range from approximately $124,000 to $869,000, and monthly service fees range from approximately $2,420 to $5,760.

Apart from the monthly service fee, an agreement for occupancy of a Rental Unit generally resembles a typical residential apartment lease.  The rental agreement is month to month, with 60 days written notice to terminate, although it automatically terminates if the resident dies.  Security deposits are held in a segregated account as required by Massachusetts law.  Assuming that there are no unpaid charges or damage to the living unit, the Security Deposit is refunded in full upon expiration of the Residency Agreement.

For Residency Agreements other than those pertaining to Rental Units ("Non-Rental Residency Agreements"), a resident may terminate the Residency Agreement before or after occupancy of a unit, by giving written notice to Groves.  Non-Rental Residency Agreements automatically terminate upon the resident's death.  If a prospective resident terminates a Non-Rental Residency Agreement prior to occupancy, the prospective resident is entitled to a full refund of the Entrance Fee Deposit within 30 days of termination.  If a Non-Rental Residency

Agreement terminates after occupancy, the resident is entitled to a refund of a portion of the Entrance Fee.  The amount of the refund depends on the type of Residency Agreement and duration of the occupancy.

- Under the 90% Refundable Residency Agreement, if termination of the Residency Agreement occurs within the first nine months following occupancy, the resident is entitled to a refund equal to 100% of the Entrance Fee less 1% of the Entrance Fee for each month the resident occupied the unit.  If termination occurs after the ninth month, the resident is entitled to an Entrance Fee refund equal to 90% of the Entrance Fee.

- Under the 50% Refundable Residency Agreement, if termination of the Residency Agreement occurs within the first 49 months following occupancy, the resident is entitled to an Entrance Fee refund equal to 100% of the Entrance Fee less 1% of the Entrance Fee for each month the resident occupied the unit.  If termination occurs after the 49th month, the resident is entitled to an Entrance Fee refund equal to 50% of the Entrance Fee.

- Under the 0% Refundable Residency Agreement, if termination of the Residency Agreement occurs within the first 100 months following occupancy, the resident is entitled to an Entrance Fee refund equal to 100% of the Entrance Fee less 1% of the Entrance Fee for each month the resident occupied the unit.  If termination occurs after 100 months, the Entrance Fee is considered to have been fully amortized and the resident is not entitled to a refund.

The Non-Rental Residency Agreements uniformly provide that when a resident has a right to a refund of a portion of the Entrance Fee, the refund is payable upon the first to occur of: (i) occupancy of the same type of unit by a new resident, for which Groves receives an Occupancy Payment not used to pay a refund to another resident; or (ii) the expiration of 12 months after termination of the Residency Agreement.[6]  As of the Petition Date, the occupancy level at The Groves was 56.5%, with 134 individual residents occupying 95 of The Groves's 168 independent living units.

---

[6] In connection with BSL's proposal to acquire substantially all of the Debtors' assets pursuant to the APA, BSL obtained amendatory agreements from residents who are parties to more than 95% of the existing Non-Rental Residency Agreements.  In exchange for certain benefits including BSL's commercially reasonable efforts to obtain zoning, permitting and licensure approval for and thereafter to develop a continuum of assisted living, dementia and skilled nursing care at The Groves, these residents agreed that effective upon BSL's acquisition of The Groves, Entrance Fee refunds would be payable upon the occurrence upon the earlier of (a) occupancy of the actual unit vacated by the terminating resident, or (b) expiration of ten years after termination of the Residency Agreement, subject to the election of the resident to instead receive the original Entrance Fee less 1% per month of occupancy if the vacated unit has not been resold within a reasonable period of time, as determined by BSL.  In addition, for non-death move-outs within two years after the closing under the APA, the Entrance Fee refund shall not be made until the later of the second anniversary of the closing or the resale of resident's vacated unit.

### E.    The Debtors' Liabilities

#### 1.    The Bonds

The Bonds are by far the largest of the Debtors' liabilities.  As of the Petition Date, the principal balance of the Bonds was approximately $88,430,000.  As described above under "Financing," the Collateral securing repayment of the Bonds includes The Groves and certain assets.  As of the Petition Date, assets held by the Bond Trustee as security for the Bonds consisted of a Debt Service Reserve Fund of approximately $7,811,045, an Operating Reserve Fund of approximately $1,130,897, and approximately $345,305 in other various funds established under the Loan Agreement and held by the Bond Trustee.[7]  Collateral for the Bonds also included, as of the Petition Date, an undrawn balance of approximately $2,583,732 under the LSA, and a balance of approximately $100,000 in the Debtors' bank account.  As provided by the Sale Order, the Bond Trustee has received approximately $1,318,800 in previously-escrowed Entrance Fees.  (These are Entrance Fees received in connection with Non-Rental Residency Agreements signed on or before January 8, 2013, which, to protect the individuals providing these funds in the face of the Debtors' financial difficulties, were held in escrow pending the closing of the sale to BSL, pursuant to the Escrow Agreement for Benefit of Residents dated January 25, 2013, by and among the Debtors, the Bond Trustee and, as escrow agent, the accounting firm of Verdolino & Lowey, P.C. (the "Entrance Fee Escrow Agreement") and a certain Escrow-Related Agreement dated January 25, 2013 between the Debtors and the Bond Trustee.)  Even taking account of these cash balances exceeding $14 million and disregarding the process costs necessary to achieve going-concern value for The Groves, the Bonds are significantly under-secured in light of any credible fair market value of Groves, including as established by the APA.

#### 2.    Residents

Until the Closing of the APA, residents of The Groves held contingent claims for the damage claims that would be allowed if their Residency Agreements were to be rejected.  The Debtors' accrued liability for Entrance Fee refunds was approximately $42,772,956 as of the Petition Date.  Of this total, $2,721,700 is held in escrow pursuant to an escrow program implemented by the Debtors for new Entrance Fees and deposits under Non-Rental Residency Agreements beginning in November 2012, and later embodied in the Entrance Fee Escrow Agreement.  In addition, Security Deposits for Rental Units are held in a segregated account as required by Massachusetts law.  In accordance with the APA, the Debtors' obligations to its residents were assigned to and assumed by BSL incident to its purchase of The Groves.  Accordingly, the Debtors expect the actual cost to the Debtors' bankruptcy estates of the residents' contingent claims to be zero.

---

[7] As of the Petition Date, the Bond Trustee also held an escrow account in the amount of approximately $411,675 for real estate taxes due to the Town of Lincoln, Massachusetts on May 1, 2013.  The Bond Trustee has disbursed the funds in payment of such taxes.

### 3.      Contract Damage Claims

Other contingent claims against the Debtors consist of damage claims that could be asserted by counterparties to executory contracts with the Debtors, if the Debtors were to reject such contracts.  Allowed claims of this type will be zero to the extent that such contracts are assigned to and assumed by BSL.  The Debtors estimate that allowed claims based on the Debtors' rejection of contracts that BSL did *not* assume under the APA will be approximately $13,000.

### 4.      Goods and Services

Even during the financially troubled period leading to commencement of these Chapter 11 Cases, the Debtors kept reasonably current in paying undisputed trade obligations.  However, the Debtors owe approximately $55,000 for goods and services supplied before the Petition Date.

### 5.      Members

The Debtors owe approximately $20,404,566 to Groves's members, MHS and Deaconess.  These obligations are expressly subordinated to the rights and interests of the Bond Trustee under the Bonds and Loan Agreement.

### F.      <u>Events Leading to Chapter 11</u>

At the time of the bond financing in November 2009, Groves reported reservation deposits on 103 of its 168 independent living units.  This represented a prospective occupancy level of 75% provided that all of these reservations converted to actual occupancies following completion of construction.  What happened instead is that The Groves experienced a high level of Entrance Fee Deposit cancellations.  From closing of the Bond financing in November 2009 through the opening of The Groves in July 2010, Groves reported 30 Entrance Fee Deposit cancellations, as against 16 new reservation deposits.  This resulted in a reduction from 75% to 65% of the potential occupancy percentage upon completion of construction.  Personal financial issues were the primary reason cited by individuals who cancelled their Entrance Fee Deposits.

These cancellations were consistent with the substantial declines in entrance fee deposits then being experienced by other senior living facilities that were either under construction or just opening.  Potential residents of senior living facilities typically faced difficulty selling their homes in a weak housing market, along with significant declines in their equity portfolios.  These economic circumstances have made it difficult for seniors to move into communities like The Groves.  Many prospective residents rely on proceeds from the sale of their homes to fund the upfront Entrance Fees.  Many are further challenged by payment of monthly fees and other monthly living expenses because of decreases in the value and/or cash yield of their investment portfolios.

Given these difficult market conditions, Groves has struggled to maintain a sustainable pace of new resident reservations and move-ins since its July 2010 opening.  Groves took several steps to try to increase the velocity of new move-ins and reservation deposits.  Groves initiated a home-purchase program to assist in funding Entrance Fees, implemented other incentive

programs intended to create urgency and value for potential residents, and reduced Entrance Fee and monthly fee pricing.  Despite these efforts, net move-ins at The Groves did not increase. This left Groves with lower than anticipated revenue, causing Groves to fail to make debt service payments under the Loan Agreement in October 2012.  Seeing the writing on the wall, Groves commenced discussions with the Bond Trustee several months prior to default.

## IV.   THE CHAPTER 11 CASE AND PLAN

### A.   Negotiation of the Plan

Discussions that Groves initiated with the Bond Trustee and certain institutional bondholders in the summer of 2012 centered around how to address Groves's near-term liquidity issues and its long-term inability to repay the Bonds in full.  The parties agreed that the two strategic options most likely to be capable of execution were (i) sale of substantially all of Groves's assets, or (ii) restructuring of the Bonds with a new sponsor replacing MHS (the "Strategic Options").   A third potential option, restructuring under MHS's continued sponsorship, was rejected by MHS because of its own change of strategic direction.  Groves, MHS, the Bond Trustee and certain bondholders agreed to explore the two Strategic Options simultaneously under a dual track process.  In order to receive the confidential information necessary to effectively participate in the process, institutional bondholders representing about 70% of outstanding principal amount of the Bonds executed confidentiality and trade-restriction agreements (the "Majority Bondholders").   To assure adequate time for this process despite Groves's insufficient cash flow to pay debt service on the Bonds while also meeting its operating expenses, Groves, the Bond Trustee and MHS negotiated the terms of a liquidity proposal which became the basis of the Forbearance Agreement entered into between Groves, MHS and the Bond Trustee on January 25, 2013.  The Forbearance Agreement provided that, among other things, Groves would cease making debt service payments commencing November 2012, amounts on deposit in the Operating Reserve Fund could be used to fund operating expenses under certain circumstances and MHS would transfer the amounts available under the LSA to the Bond Trustee pursuant to the provisions thereof.

The dual-track process to explore the Strategic Options played out from August 2012 through February 2013.  Groves engaged RBC Capital Markets, LLC ("RBC") as its investment banker.  RBC solicited proposals from third parties for either a purchase of The Groves or a restructuring of its debt.  The proposals received were carefully reviewed by Groves, MHS, the Bond Trustee and the Majority Bondholders.  They consulted with each other through weekly phone calls and almost daily email contact.  At the conclusion of the solicitation process, the parties reached a consensus to narrow the field to two potential offerors, who would be granted certain protections under a "dual exclusivity" arrangement.  Accordingly, Groves negotiated two letters of intent.  One was with BSL for a sale of substantially all of the assets of Groves.  The other was with Deaconess for a restructuring of the Bonds accompanied by Deaconess's return to sole sponsorship of Groves.

The next step entailed negotiating an asset purchase agreement with BSL and a debt restructuring plan with Deaconess.  Groves took the lead negotiating with BSL and the Bond Trustee and the Majority Bondholders took the lead in negotiating with Deaconess.  After thoroughly reviewing and discussing the benefits and risks of the proposals by Deaconess and

BSL, a consensus was reached among Groves, the Bond Trustee, the Majority Bondholders and MHS that the terms of the sale to BSL provided the greatest value for the creditors and residents, subject to soliciting further offers. Groves finalized the APA with BSL, and commenced the Chapter 11 cases for the purpose of effectuating the sale through the procedures approved by the Bankruptcy Court.

Along with its Chapter 11 petition, the Debtors filed the Sale Motion. The Sale Motion requested authority to sell the Debtors' assets to BSL under the APA, subject to higher or better offers. As is customary for a Chapter 11 sale outside of a plan, the Sale Motion sought approval of bid procedures under which others would have the chance to bid against BSL's offer. The terms of the Bid Procedures Order were negotiated among the Debtors, the Bond Trustee, and the Creditors' Committee, which had then been formed as the official representative of general unsecured creditors, including residents of The Groves.[8]

### B. Basis of the Plan

The assets sold to BSL include the Debtors' (i) interest in real property located Lincoln, Massachusetts, (ii) personal property (including furniture, fixtures and equipment used to operate the Debtors' business); (iii) Residency Agreements with the residents of The Groves, and other executory contracts and leases of the Debtors, as designated by BSL; and (iv) other miscellaneous specified assets (collectively the "Purchased Assets").

The material terms of the APA are as follows:[9]

(1) <u>Purchased Assets</u>: Pursuant to Section 2(b) of the APA, Purchased Assets includes any and all tangible and intangible real and personal property and assets of and owned by the Debtors that are used in connection with the operation of the business conducted at The Groves.

(2) <u>Excluded Assets</u>: Pursuant to Section 2(c) of the APA, the Purchased Assets did not include any and all (i) cash, cash equivalents, investments, or reserve funds pledged by the Debtors to the Bond Trustee, (ii) certain Entrance Fee Escrowed Funds set forth in Schedule 1(ii) of the APA, (iii) insurance policies, tax refunds, rights under contracts that are not Assumed Contracts, and (iv) the Debtors' Causes of Action, including Causes of Action arising under Chapter 5 of the Bankruptcy Code, except as expressly included in or directly related to the Purchased Assets.

---

[8] See Section IV(C)(3) below.

[9] Capitalized terms used but not defined in this section have the same meaning ascribed to such terms in the Asset Purchase Agreement, which is on file with the Court as an exhibit to the Debtors' Motion to (a) Authorize Sale of Substantially All of their Assets Free and Clear of All Liens and Other Interests, (b) Authorize Assumption and Assignment of Certain Contracts and Leases in Connection Therewith, (c) to Approve Sale Procedures Therefor, and (d) for Other Related Relief filed March 11, 2013 [Docket No. 12]. You may obtain a copy of the APA by requesting same from Keri Wintle or Ashley Whyman (the Debtors' attorneys) at kwintle@murthalaw.com or awhyman@murthalaw.com or by calling 617-457-4000.

(3)    <u>Purchase Price and Deposit</u>:  Pursuant to Section 3 of the APA, BSL has paid the Debtors $30,000,000 in cash, subject to adjustment as provided in the APA, and is obligated to make an additional payment of up to $5,000,000 in cash contingent upon the success and timing of BSL's receipt of approvals to construct an Assisted Living/Alzheimer's Care facility at the Debtors' site in addition to the already-existing senior living facility (the "Contingent Payment").

(4)    <u>Assumed Liabilities</u>:    BSL has assumed all Residency Agreements, including obligations to refund Entrance Fees and Security Deposits thereunder, subject to certain consensual amendments signed by over 90% of the residents with Non-Rental Residency Agreements as described in the APA.  Pursuant to Section 1(m) of the APA, BSL agreed to be responsible for (i) payment of up to $100,000 in cure costs for monetary defaults under the Assumed Contracts; (ii) post-Closing liabilities under Assumed Contracts; and (iii) any unpaid commissions due by Seller on account of any Entrance Fees constitute Purchased Assets under the APA.

(5)    <u>Sale Free and Clear</u>:  Pursuant to Section 5 of the APA, the Purchased Assets were sold or assumed and assigned, as applicable, pursuant to the Plan and Sections 363(f) and 1141(c) of the Bankruptcy Code, free and clear of any and all liens, mortgages, security interests, pledges, charging orders, other encumbrances, claims (as defined in Section 101(5) of the Bankruptcy Code), and/or interests of any kind or nature whatsoever whether imposed by agreement, understanding, law, equity or otherwise, including rights of any party under the Members Agreement, other than Permitted Encumbrances and Assumed Liabilities.

(6)    <u>Employees</u>:  Pursuant to Section 15 of the APA, BSL is not required to retain any employee of Debtors or assume any employment agreement or employee benefit plan.  Nevertheless, the APA permits BSL to offer employment to any or all employees of Groves.  Any such offers shall be at such salary or wage and benefit levels and on such other terms and conditions as BSL shall in its sole discretion deem appropriate.  Effective immediately prior to the Closing, the Debtors terminated the employment of all employees.  Immediately upon the Closing, employees with whom BSL reached agreement regarding employment became employees of BSL.

## C.    <u>Other Significant Events in this Chapter 11 Case</u>

### 1.    **The Automatic Stay**

Under the Bankruptcy Code, filing of the Debtors' petitions under Chapter 11 triggered what is known as the "automatic stay" – essentially an injunction against collection activity by creditors, interference with the Debtors' possession of their assets, and similar activities.  At the

same time that creditors are barred from collecting prepetition claims, the Debtors are barred from paying them.  The purpose of the automatic stay is to assure an orderly bankruptcy process centralized in the bankruptcy court.  Instead of pursuing collection lawsuits, creditors file proofs of claim with the bankruptcy court.  Instead of determining creditors' rights through a race to the courthouse, similarly situated creditors are treated *pro rata*.  Instead of dismembering the Debtors through foreclosures and sheriffs' sales, disposition of the Debtors' assets is determined through bankruptcy court orders entered after notice and an opportunity for all parties to be heard, or through a Chapter 11 plan voted on by impaired creditors.

## 2.    Cash Collateral Orders

Although the automatic stay suspended demands on the Debtors' cash flow to pay prepetition claims, the Debtors still needed to meet their postpetition obligations, including operating expenses and the professional charges necessary to pursue the Chapter 11 cases.  The Bankruptcy Code, however, permits a debtor to use cash, deposit accounts and other liquid assets that are subject to a creditor's lien only with the secured creditor's permission or an order of the bankruptcy Court.  Typically such agreement or order can be obtained only by providing the secured creditor with what is called "adequate protection" – essentially, reasonable assurance that the value of its collateral position will not decline because the debtor's use of cash collateral.

To provide funds to meet postpetition obligations, the Debtors reached agreement with the Bond Trustee on the terms of an order permitting use of cash collateral, which was entered as an interim order of the Court on March 13, 2013 and as a final order on April 22, 2013.  This final order has since been amended (as amended, the "Final Cash Collateral Order") to extend the use of cash collateral through the week ending July 19, 2013, with the expectation there will be a further extension through the end of August, by which time the Effective Date of the Plan is expected to occur, terminating the need for court authorization for use of cash collateral.  Among the terms of the Final Cash Collateral Order relating to the availability of funds are:

- The Debtors may use cash collateral in accordance with an agreed Budget, subject to a small permitted variance.

- Adequate protection is supplied to the Bond Trustee primarily through a replacement lien on postpetition assets and a "super-priority claim" – that is, an unsecured claim payable ahead of all other such claims, even those entitled to statutory priority – to the extent of any diminution in the value of the Bond Trustee's cash collateral resulting from the Debtors' use thereof.

- Nevertheless, the Debtors may use draws on the LSA in order to pay operating expenses and professional fees.

## 3.    Creditors' Committee

Since it is usually impractical for unsecured creditors to participate directly in a Chapter 11 case, the Bankruptcy Code provides for an official committee of unsecured creditors (which usually selects counsel to represent the committee at the expense of the bankruptcy estate) to represent the interests of unsecured creditors as a group.  The membership of the creditors'

committee typically includes the largest unsecured creditors who are willing to serve, provided that they are representative of the creditor body.  In this case, an official creditors' committee has been appointed consisting of seven residents of The Groves (the "Creditors' Committee").  As its counsel, the Creditors' Committee has engaged:

> George W. Tetler, III
> Bowditch & Dewey
> 311 Main Street
> PO Box 15156
> Worcester, MA 01615
> Tel: (508) 791-3511
> Fax: (508) 756-7636
> gtetler@bowditch.com

The Creditors' Committee was actively involved in negotiation of the Bid Procedures Order and the Plan.  Having accomplished its key objectives of protecting residents of The Groves, who hold approximately $42,772,956 of contingent General Unsecured Claims, and obtaining a satisfactory distribution for other general unsecured creditors, the Creditors' Committee recommends that all general unsecured creditors vote for and support the Plan.

## V.    CLASSIFICATION OF CLAIMS AND THEIR TREATMENT UNDER THE PLAN

The Debtors' liabilities and member interests, and their treatment under the Plan, are described below in the following order:

A.    **Bond Claims** (Class 1)

B.    **Smaller Secured Claims** (Classes 2-A, 2-B and 2-C)

C.    **Claims Arising During the Chapter 11 Case** (Administrative Claims–Unclassified)

D.    **Other Priority Claims** (Unclassified and Class 3)

E.    **General Unsecured Claims** Against Groves (Class 4) and Apartments (Class 5)

F.    **Members' Claims and Interests** (Classes 6, 7 and 8)

### A.    Bond Claims (Class 1)

Bond Claims – defined as the full outstanding amount of the Bonds in accordance with their terms as of the Petition Date regardless of whether considered secured or unsecured – are placed in Class 1.  The Plan provides for Bond Claims to be paid by the Bond Trustee in accordance with the provisions of the Loan Agreement, utilizing funds received or retained by the Bond Trustee pursuant to the Plan or under the Sale Order.  The Debtors will have no responsibility or liability for distributions on account of Bond Claims, which are the sole

responsibility of the Bond Trustee.  The Debtors' sole responsibility in connection with Bond Claims will be to turn over to the Bond Trustee (or in the case of funds already held by the Bond Trustee, relinquish any right of the bankruptcy estate to) funds consisting of:

- Proceeds from the Sale, after payment of (i) RBC's commission of $475,000[10] plus approximately $30,000 of reimbursable expenses, (ii) other secured claims of approximately $82,605, and (iii) transfer taxes of approximately $120,000;

- The Bond Trustee Funds, consisting of the Debt Service Reserve Fund of approximately $7,811,045 and other funds of approximately $345,305 that the Debtors and the Bond Trustee have agreed are outside the bankruptcy estate;

- The Operating Reserve Fund, which holds approximately $1,130,897.63, plus an additional $250,000 to be transferred into the Operating Reserve Fund pursuant to the terms of the Expense Escrow Agreement;[11]

- Amounts distributed to the Bond Trustee from the Entrance Fee Escrow Agreement, expected to be approximately $1,318,800;

- Remaining proceeds of the LSA under the terms of the LSA – referred to in the Plan as the MHS Contribution – after credits to which MHS is entitled under the terms of the LSA and after payment of various claims and Plan Expenses required by the Plan or agreements between MHS and the Bond Trustee;

- Any amounts held in the Debtors' bank accounts in excess of necessary amounts, projected to be zero; and

- Any amount realized by the Plan Trustee from sale of Apartments, also expected to be zero.

Based on the expected proceeds, it is estimated that bondholders will recover from 48% to 63% of the outstanding principal amount of the Bonds, depending on the series of Bonds.  If the BSL Contingent Payment is not paid, the total recovery is estimated to be from 44% to 57% depending on the series of Bonds.

The Plan provides that the Final Cash Collateral Order will continue in effect for the benefit of the Bond Trustee, disregarding provisions that might have the effect of terminating such order by reason of the Effective Date or appointment of the Plan Trustee.

---

[10] The computation is based on $30,000,000 of proceeds at a Closing occurring after RBC received 11 monthly fee payments of $50,000 each.  Under its engagement agreement, RBC is entitled to a fee of $50,000 per month, plus a success fee of 2.5% minus half of the monthly fees received by RBC.  In addition, RBC will earn its 2.5% success fee on the BSL Contingent Payment if and when it is collected for distribution to bondholders.

[11] The Expense Escrow Agreement, dated December 11, 2012, by and between the Bond Trustee, the Debtors and BSL (the "Expense Escrow Agreement").

Beneficial holders of Bond Claims have the right to vote to accept or reject the Plan. For details, please see Section XVIII(B) below, "Voting Procedures." In particular, if you hold Bonds through a brokerage account, there are special procedures you need to follow. They take extra time, so in order to make sure your vote is received by the deadline, please do not delay.

**B.     Other Secured Claims (Classes 2-A, 2-B and 2-C)**

Class 2-A consists of the Secured Claim of Terex Financial Services in the Petition Date amount of $12,346. Class 2-B consists of the Secured Claim of Ally Financial in the Petition Date amount of $58,494. Class 2-C consists of the Secured Claim of Kubota Credit Corporation, U.S.A., in the Petition Date amount of $11,765. Each of these claims was secured by a first lien on one or more motor vehicles that were sold to BSL pursuant to the APA. From the Sale proceeds, each of these claims has already been paid in full, effectively superseding the provisions of the Plan relating to these Claims.

**C.     Claims Arising During the Chapter 11 Case**

Administrative Claims are liabilities incurred during the Chapter 11 cases, including operating expenses, professional fees, and quarterly fees payable to the Office of the United States Trustee. Under the Bankruptcy Code, with exceptions not pertinent here, Administrative Claims are entitled to priority payment over all unsecured claims arising before the Petition Date and must be paid in full as a condition of confirming the Plan. Accordingly, the Plan provides that Allowed Administrative Claims will be paid in full, in Cash on the Effective Date.

**Any claim entitled to priority under Section 507(a)(1) of the Bankruptcy Code, arising before the Effective Date and still outstanding as of the Effective Date, shall be forever barred unless it is the subject of a proof of claim or request for payment (or, in the case of a professional person, a fee application) filed with the Court on or before the Postpetition Bar Date, which is the first Business Day following the 30th day after the Effective Date.**

**1.     Suppliers of Goods and Services**

The Debtors have been paying when due their suppliers' invoices for goods and services provided since the Petition Date. Based on normal credit terms, at any given time there are amounts of accrued but unpaid operating expenses. As of the Effective Date, such accruals are projected to total approximately $190,000 as of the Effective Date. To the extent known by the Plan Trustee, such claims will be paid on the Effective Date or as soon thereafter as practicable. There may be some delay, however, as final invoices are received over the several weeks following the Effective Date. These invoices will be paid by the Plan Trustee as received, subject to his verifying the amount.

**2.     Employees**

Although most of the Debtors' employees are now employed by BSL, they were, as a legal matter, "terminated" by the Debtors as of the Closing and, thus, entitled to amounts such as accrued paid time off. These amounts were paid at or before the Closing. In addition, the

15

Debtors expect to obtain Court approval to settle claims of certain employees for underpayment of wages before and during the Chapter 11 Cases through Administrative Claims totaling about $35,000.  Finally, the Debtors' chief financial officer has certain rights under his pre-bankruptcy employment contract with Groves, including the right to a bonus of $250,000 based on the amount of proceeds realized under the Sale.  However, instead of collecting his bonus and/or termination damages from the Debtors, he was paid the amount of his bonus, utilizing funds of MHS, after the Closing.

### 3.      Professional Persons

Pursuant to interim compensation procedures approved by the Court, professional persons entitled to compensation from the Debtors' bankruptcy estate are paid for a particular month's charges approximately four weeks after the end of the month, with a small holdback.  Thus, at any given time, the Debtors' accrued but unpaid professional charges will represent between one and two months' billings.   The Debtors estimate that the following amounts for professional fees and reimbursement of professionals' expenses and quarterly fees to the United States Trustee were accrued and unpaid as of the Closing[12]:

| | |
|---|---|
| Murtha Cullina LLP<br>Counsel to the Debtors | $235,000 |
| Verdolino & Lowey, P.C.<br>Financial Advisors to the Debtors | $180,000 |
| Bowditch & Dewey,<br>Counsel to the Creditors' Committee | $ 85,000 |
| United States Trustee Quarterly Fees | $   6,500 |
| **TOTAL** | $476,500 |

### D.      Other Priority Claims

Claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code include most taxes arising before the Chapter 11 Cases.  Priority Tax Claims total zero according to the Debtors' records.  However, taxing authorities are permitted to file claims up until September 9, 2013, so it is possible that additional claims will be asserted, even if incorrectly.  In accordance with the Bankruptcy Code, Priority Tax Claims are not placed in a class and do not vote on the Plan.  The Plan provides for each Allowed Priority Tax Claim to be paid in full in Cash on the Effective Date.

The Debtors believe that there will be no Allowed Claims entitled to priority under other subparts of Section 507(a) that might be applicable to the Debtors.

---

[12]   Additional fees will be incurred to wrap up the Debtors' affairs and administer the Plan, which will be included as part of the Plan Expenses.

E.     **General Unsecured Claims**

Unsecured Claims not entitled to priority under the Bankruptcy Code are called "general unsecured claims." If you supplied goods or services to either Groves or Apartments prior to the commencement of these Chapter 11 cases on March 11, 2013 (the "Petition Date") and you have not been paid, then you probably hold a General Unsecured Claim. The Plan places General Unsecured Claims against Groves in Class 4 and General Unsecured Claims against Apartments in Class 5.

In order to be Allowed, your General Unsecured Claim must either (1) be listed by Groves or Apartments in their Schedules filed with the Court as a liability *other than a liability that is disputed, unliquidated or contingent,* or (2) be set forth in a proof of claim properly filed with the Court on or before the Bar Date, which for most claims was June 27, 2013.[13] Any such claim will be deemed Allowed unless an objection to the claim is filed – in which case you will receive notice and an opportunity to respond – and the Claim is then Disallowed by Order of the Court. Allowance of Claims is described in greater detail below. See Section VII.

The Plan provides identical treatment of General Unsecured Claims whether Allowed against Groves (Class 4) or Apartments (Class 5). MHS has agreed to create a General Unsecured Fund in an amount equal to 50% of the total amount of Allowed General Unsecured Claims, but not greater than $32,500, which will be turned over to the Plan Trustee on the Effective Date to be used for payment of General Unsecured Claims.

If you hold an Allowed General Unsecured Claim, your distribution will equal 50% of the Allowed Amount of your Claim or a *pro rata* share of the General Unsecured Fund. If the total of all Allowed General Unsecured Claims is $65,000 or less, then you will receive 50% of the Allowed Amount of your Claim. If Allowed General Unsecured Claims total more than $65,000, you will receive your *pro rata* share of the General Unsecured Fund, defined as: General Unsecured Fund *times* Allowed Amount of your General Unsecured Claim *divided by* aggregate Allowed Amounts of all General Unsecured Claims.

The Debtors have forecast that Allowed General Unsecured Claims will total approximately $68,000. If this forecast is correct, then as the holder of an Allowed General Unsecured Claim you will receive approximately 48% of the Allowed Amount of your Claim. However, the inherent difficulties of forecasting Allowed Claims in any bankruptcy case mean that creditors should not rely on this forecast.

The likelihood that General Unsecured Claims will be paid less than in full means that each class of General Unsecured Claims is treated under the Plan as impaired and is entitled to vote to accept or reject the Plan. The Creditors' Committee, which is the official representative

---

[13] The Court approved the Bar Date pursuant to its Order entered May 13, 2013 [Docket No. 156]. This order also approved a form of notice to creditors (the "Bar Date Notice"). As a general unsecured creditor, you should have received this notice in a separate mailing. If you did not, please contact Keri Wintle or Ashley Whyman (who serve as the Debtors' lawyers) at kwintle@murthalaw.com or awhyman@murthalaw.com or by calling 617-457-4000. A copy of the Bar Date Notice is annexed to this Disclosure Statement as Exhibit 2.

to negotiate the terms of the Plan on behalf of all general unsecured creditors, supports the Plan and recommends that you vote to accept it.

### F.      Members' Claims and Interests

Claims against Groves by its members, MHS and Deaconess, total approximately $20,404,566.  Pursuant to the Member Claims Agreement by and among Groves, Deaconess and MHS dated May 29, 2013 (annexed to the Plan as <u>Exhibit A</u>):

- MHS and Deaconess waived any right to receive or retain property on account of the Members' interest in Groves under the Plan;

- MHS and Deaconess acknowledge that they will receive no consideration on account of their 80% and 20% respective member interests in Groves;

- MHS and Deaconess will release each other, and must be supplied a release by the Debtors under the Plan; and

- Consistent with their mission as charitable organizations concerned with the welfare of residents of The Groves, the members' commitments described above are conditioned on assumption by BSL of all obligations of Groves under Residency Agreements.  This condition was satisfied at the Closing.

Since the Plan fulfils the conditions for the Member Claims Agreement to be effective, the Claims and interests of MHS and Deaconess are treated as unimpaired under the Plan, such that MHS and Deaconess are deemed to have accepted the Plan.

### VI.     MEANS OF IMPLEMENTATION

#### A.      Effective Date

The day that the Plan will take effect is defined in the Plan as the "Effective Date."

#### B.      Funds Remitted to Bond Trustee.

At the Closing, proceeds of the Sale, less payment to RBC, were remitted to the Bond Trustee.  Pursuant to the Sale Order, the Bond Trustee now holds the Operating Reserve Fund and $250,000 remitted to the Bond Trustee from the Expense Escrow Agreement free and clear of any obligation to the Debtors or any assertion that the funds are property of the bankruptcy estate.  Also pursuant to the Sale Order, approximately $1,318,800 from the Entrance Fee Escrow has been turned over to the Bond Trustee along with the entire balance of the Debtors' bank accounts other than the amount necessary to cover outstanding checks.  As of the Closing, the Debtors received from MHS the amount of the MHS Contribution, representing the undrawn amount of the LSA, less amounts necessary to fund the wrap-up of the Debtors' affairs, payments to certain other creditors as required by the Plan, and credits to which MHS is entitled

under the LSA.  The Plan provides for the remaining amount of LSA proceeds to be turned over to the Bond Trustee.

As a post-Closing payment by BSL, the Bond Trustee may receive up to an additional $5,000,000.  Pursuant to the APA, the Bond Trustee will be entitled to payment of the Contingent Payment in the event BSL receives approvals to construct an Assisted Living/Alzheimer's Care facility at the Debtors' site in addition to the already-existing senior living facility (as defined in the APA, the "AL/ALZ Approval Date").  If the AL/ALZ Approval Date occurs on or before the second anniversary of the Closing Date, the amount of the Contingent Payment will be $5,000,000.  If the AL/ALZ Approval Date occurs after the second anniversary but on or before the third anniversary of the Closing Date, the amount of the Contingent Payment will be $2,500,000.  After the third anniversary of the Closing Date, no Contingent Payment shall be due.  The Plan provides the Bond Trustee with the exclusive right and power to enforce the provisions of the APA relating to the Contingent Payment.  If it becomes payable, the Contingent Payment will be due within 30 days after the AL/ALZ Approval Date.  Like other proceeds of the Sale, the Contingent Payment will be subject to a 2.5% commission to RBC.

All of the foregoing amounts, together with the Debt Service Reserve Fund and other funds held by the Bond Trustee under the Loan Agreement, will be available for distribution to the holders of Bonds in accordance with the Loan Agreement.

### D.   Plan Trustee

The Plan provides for appointment of a Plan Trustee who will assume control of the Debtors on the Effective Date, supplanting the corporate governance functions of the members, directors and officers.  The key functions of the Plan Trustee are to make distributions to creditors and wrap up the Debtors' affairs, including filing final tax returns and closing the Chapter 11 cases.  Keith D. Lowey of the accounting firm of Verdolino & Lowey, P.C., will serve as Plan Trustee.  Mr. Lowey's familiarity with bankruptcy and experience in winding down dozens of businesses assures that he will capably and efficiently serve the Debtors' bankruptcy estates.

The Plan Trustee will make distributions to holders of Allowed Claims on the Effective Date or as soon as practicable thereafter.  To the extent that objections to the allowance of Claims are not resolved by the Debtors prior to the Effective Date, the Plan Trustee will litigate or settle such objections.  To the extent that any settlement agreement or disposition of assets would have required Court approval prior to the Effective Date, the Plan Trustee must obtain approval of either the Bond Trustee or the Bankruptcy Court before taking such action.  However, no approval is required if the assets or claims involved have a liquidation value of not more than $50,000.

To assist in discharging his duties, the Plan Trustee will have the authority to engage professionals, such as lawyers or accountants.  In his discretion, these professional persons may include those who have previously served the bankruptcy estates.  The Plan Trustee and professional persons he employs will be entitled to reasonable compensation and reimbursement

of customary expenses as provided in the Plan. The Plan Trustee will have no liability for his acts or omissions except in the event of gross negligence or willful misconduct. The Plan provides that no bond will be required of the Plan Trustee.

## VII.   ASSERTION AND ALLOWANCE OF CLAIMS

Sections VII(A) and (B) immediately below apply to Claims *other than Bond Claims*. If you are a beneficial holder of Bonds, please skip to Section VII(C) below, "Bond Claims."

### A.   How to Assert a Prepetition Claim

No Claim will be paid unless it is Allowed. In order to be Allowed, a Claim must first be asserted.

A Claim arising before the Petition Date, or for damages under a contract with the Debtors made before the Petition Date, is asserted in either of two ways. First, your claim will be deemed asserted if it is listed in the Schedules filed with the Court by Groves or Apartments as an obligation that is not disputed, unliquidated or contingent. If your Claim is so listed and you agree with the amount listed in the Schedules, then there is nothing further you need to do to assert your Claim.

The second way of asserting a Claim is to file a proof of claim with the Bankruptcy Court. The Debtors sought and obtained from the Bankruptcy Court an Order setting a Bar Date, that is, a deadline for filing proofs of claim. If you failed to file a proof of claim with the Bankruptcy Court on or before the Bar Date, your Claim will be forever barred as a Claim against the Debtors except under very special circumstances prescribed by the courts. For most Claims, the Bar Date was June 27, 2013. A copy of the Bar Date Notice sent by the Debtors to all of their known creditors is attached to this Disclosure Statement as Exhibit 2.

If a Claim is listed in the Schedules and is the subject of a proof of claim, the proof of claim will supersede the Schedules. Thus, if you have any question or concern about how your Claim is listed in the Schedules, the safe course is to file a proof of claim.

Proofs of claim must substantially conform to Official Form B 10, or utilizing one of the Claim Forms attached to the Bar Date Notice. A proof of claim must specify whether the asserted Claim is against Groves or Apartments. If you have already filed a correct and complete proof of claim, you need not file another one.

If you are a party to a contract with Groves or Apartments that was not assumed by BSL and you will have legally recoverable damages by reason of rejection by the Debtors of your contract, then in order to assert a claim for those damages you were required to file your proof of claim on or before the Bar Date. Residency Agreements are an exception. Because all Residency Agreements were assumed under the Plan, the Bar Date Notice provided that *a resident of The Groves did **not** need to file a claim on account of any obligation arising under his or her Residency Agreement*, including the right to a refund of an Entrance Fee or Security

Deposit in accordance with the terms of such Residency Agreement. Now that the Residency Agreements have been assumed and are being performed by BSL, the Debtors believe that no Claims arising under Residency Agreements should or will be Allowed.

Finally, the Bankruptcy Code requires a special bar date for claims of governmental units. That date is September 9, 2013. Claim holders other than governmental units are bound by the non-governmental Bar Date of June 27, 2013 except as otherwise provided in the Bar Date Notice.

### B.   <u>Allowance of Prepetition Claims</u>

No Claim will be entitled to payment under the Plan unless it is Allowed. The Debtors reserve the right to object to any Claim on any legal basis, other than the Bond Claim which is deemed as Allowed under the Plan in an amount not less than $88,430,000. On the Effective Date, the duty and authority to object to Claims will pass to the Plan Trustee.

If an objection is filed to your Claim, you will be sent a notice explaining the grounds for the objection and what you must do if you wish to contest the objection. Any Claim to which no objection is filed will be Allowed. Accordingly, you are safe in assuming that if you do not receive notice of an objection, your Claim has been or will be Allowed, and will be paid in accordance with the Plan, ***provided that the Schedules or your proof of claim, as applicable, contain your correct current mailing address***. It is your responsibility to assure that the Debtors or, from and after the Effective Date, the Plan Trustee have your correct, current mailing address.

The Allowed Amount of any Claim to which an objection and a timely response thereto are filed will be determined by the Court.

### C.   <u>Bond Claims</u>

If you hold a Bond Claim – which, as noted above, are Claims for amounts due under the Bonds in accordance with their terms – then you need to do nothing at all in order to assert or obtain allowance of a Claim. For administrative convenience, the Plan provides for a single claim of the Bond Trustee, in the aggregate principal amount of $88,340,000 (the amount of all Bonds outstanding on the Petition Date), to be automatically Allowed. Any proof of claim for a Bond Claim filed directly against the Debtors will be Disallowed, without prejudice to the bondholder's right to obtain distributions from the Bond Trustee. The Plan provides for all distributions on account of Bond Claims to be made to the Bond Trustee, who in turn will distribute to bondholders in accordance with the provisions of the Loan Agreement pursuant to which the Bonds were issued.

Please note that if you wish to assert a claim other than a Bond Claim, even a Claim that is in some way connected with the Bonds, you must file a proof of claim. The preceding paragraph applies only to Claims for amounts due under the Bonds in accordance with their terms.

### D.   **Postpetition Claims**

A Claim arising on or after the Petition Date through and including the Effective Date is an Administrative Claim.  Any Claim arising after the Effective Date is a Plan Expense.

#### 1.   **Administrative Claims**

Administrative Claims for goods and services supplied to the Debtors during the Chapter 11 cases are being paid by the Debtors in the ordinary course of their business.  If you have received payment of such a Claim, there is nothing you need to do in order to retain the payment.  However, the Plan provides that any Administrative Claim still outstanding on the Postpetition Bar Date will not be Allowed or eligible for payment unless it is the subject of a proof of claim or request for payment (or in the case of professional fees and reimbursement of professionals' expenses, an application) filed with the Court on or before the Postpetition Bar Date.  *The Postpetition Bar Date will be the first Business Day following the 30th day after the Effective Date.*  Once the Effective Date occurs, the Plan Trustee will send a notice to all of the Debtors' creditors and their postpetition vendors stating that the Effective Date has occurred and specifying the actual calendar day of the Postpetition Bar Date.

A properly filed Administrative Claim will automatically be Allowed (except for professional fees and expenses which require Court approval) unless it is objected to within 20 days after the Postpetition Bar Date.

#### 2.   **Plan Expenses**

The Debtors will cease to operate The Groves once BSL takes possession on the Effective Date.  Thereafter, the Plan Trustee will be in charge of wrapping up the Debtors' affairs.  If you supply goods or services to the Plan Trustee, you will be paid by the Plan Trustee in the ordinary course.  Please note, however, that in order to be a Plan Expense, the liability must actually be incurred by the Plan Trustee.  The Plan Trustee must receive an invoice not later than 60 days after incurrence of any Plan Expense in order for it to be entitled to payment.

### E.   **Late-Filed Claims and Amendments**

Effective administration of the Plan requires that the Plan Trustee have certainty concerning the obligations of the bankruptcy estate.  Accordingly, the Plan provides that:

- Each Claim as to which a proof of claim was required to be filed on or before the Bar Date and as to which a proof of claim was not filed on or before Bar Date shall not under any circumstances become an Allowed Claim.  A proof of claim that has not been timely filed shall be of no force or effect whatsoever, including for purposes of any distribution made by the Plan Trustee; nor shall any action (including giving notice to the Debtors or otherwise making an "informal" proof of claim) serve for purposes of the Plan and distributions required of the Plan Trustee as a substitute for timely filing a proof of claim in accordance with the Bar Order except as otherwise determined by Order prior to entry of the order confirming the Plan.

- In no event shall the Allowed Amount of any Claim exceed the amount set forth in a required proof of claim therefor filed on or before the Bar Date except to the extent that (i) the claimant, not later than one Business Day before the Effective Date, files with the Court and serves on the Debtors so as to be received by Debtors' counsel on the same day, an amended proof of claim, and (ii) such amendment is not otherwise barred by law or by Order.

- No order allowing or disallowing a Claim may be reconsidered, pursuant to Section 502(j) of the Bankruptcy Code or otherwise, so as to increase the Allowed Amount thereof after the Effective Date.

### F.      Unknown Claims

Notwithstanding anything to the contrary contained in the Plan, if a Claim is filed with the Court by the Bar Date or the Postpetition Bar Date, as applicable, but the proof of claim is not correctly maintained in the Court's records or otherwise does not come to the Plan Trustee's attention in reviewing or making payment on account of Claims, or if the Court for any reason determines the Bar Date or Postpetition Bar Date to be inapplicable to a particular Claim filed or asserted thereafter, payment thereon shall be made as required by the Plan only to the extent possible without (a) impairing payment of Plan Expenses, or (b) requiring disgorgement of any payment or distribution previously made by the Debtors or the Plan Trustee.

## VIII.   DISTRIBUTIONS TO CREDITORS

This Section VIII applies to Claims *other than Bond Claims*.  If you are a beneficial holder of Bonds, the amount and procedure for distributions on account of your Bond Claim will be governed solely and exclusively by the Loan Agreement.

If your Claim is Allowed, you will be entitled to receive a distribution on account of your Allowed Claim as provided by the Plan.  No distribution will be made on account of any Claim unless and until it is Allowed, as described above.  Distributions to creditors will be made by check issued by the Plan Trustee.

### A.      Address for Distributions

If you filed a proof of claim, your distribution check will be sent to the address stated in the proof of claim.  If you did not file a proof of claim, your check will be sent to the address listed in the Schedules, which the Debtors prepared based on their books and records.  *If a distribution to a particular creditor is returned as undeliverable or if a distribution check remains uncashed ninety (90) days after the date of the check, the distribution will be cancelled. If the creditor does not provide a correct address prior to the completion of distributions to other creditors, the creditor will lose the right to any future distributions.*  For this reason, it is critical for you to make sure the Plan Trustee has your correct current address.

### B.    Change of Address

If your address has changed since you filed your proof of claim, or if it changes in the future, please notify the Plan Trustee of your new address.  Similarly, if you did not file a proof of claim and have any reason to believe that the Plan Trustee does not have your correct current address, please notify the Plan Trustee of your address.  In addition, if you are the transferee of a Claim, you are required to comply with Fed. R. Bankr. P. 3001(e), and serve a copy of the transfer on the Plan Trustee, so that he may make distributions in accordance with the transfer.

The Plan Trustee's contact information is as follows:

Keith D. Lowey
Verdolino & Lowey, P.C.
Pine Brook Office Park
124 Washington Street
Foxborough, Massachusetts 02035
Tel: (508) 543-1720

Please note that while you are welcome to call the office of the Plan Trustee, *written notice sent to the Plan Trustee by mail is required to notify the Plan Trustee of your address.*

## IX.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection

The Bankruptcy Code provides the Debtors with two options concerning each executory contract and unexpired lease.  The Debtors had the right to assume and assign contracts or leases to BSL, in which event, on the date of the Closing, (a) BSL was required to pay all costs to cure any defaults of the Debtors on the obligations under the contract, and (b) BSL took over and will be required to perform all of the Debtors' future obligations under the contract.  Alternatively, the Debtors may reject any contract or lease that is burdensome to the Chapter 11 estates.

### B.    Residency Agreements

The Residency Agreements governing residents' occupancy of The Groves and the services they are provided constitute the Debtors' most important executory contracts.  Pursuant to the APA, BSL has assumed and will be required to perform all of the Debtors' obligations under all Residency Agreements subject to amendments signed by certain residents that took effect on the date of the Closing.

### C.    Assumed Contracts and Leases

BSL identified certain executory contracts and unexpired leases to be included in the Purchased Assets, which were deemed assumed at the time of the Closing.  In the case of any assumed contract, the Bankruptcy Code requires the debtor to pay the other party to the contract the amount needed to bring the debtor current on its monetary obligations (the "Cure Amount").

The assertion and determination of Cure Amounts is governed by the Bid Procedures Order. BSL paid all Cure Amounts on the date of the Closing and now has sole responsibility for performing the Debtors' obligations under each assumed contract.

### D.    Rejection of All Remaining Contracts

The Plan provides that all executory contracts or unexpired leases that were not expressly assumed by BSL shall be deemed rejected by the Debtors on the Effective Date.  Thus, your contract will be rejected unless it has been assumed by BSL in connection with the Sale.

### E.    Damage Claims

In order to assert a claim for damages arising from rejection of an executory contract or unexpired lease, a proof of claim must have been filed with the Court on or before the Bar Date of June 27, 2013.  All known parties to contracts with the Debtors were previously given notice of the Bar Date by being mailed a copy of the Bar Date Notice.

## X.    OTHER PROVISIONS OF THE PLAN

### A.    Binding and Immediate Effect of Confirmation Order

Once the Plan is confirmed, the provisions of the Plan will bind all holders of Claims and interests, whether or not they accept the Plan, and any successors or assigns of such holders. Provisions of the Plan are not severable, and all parties are conclusively presumed to have relied on each and every provision of the Plan.  Accordingly, *if you have any objection to any provision of the Plan, you must object to confirmation in the manner and within the time described in the notice included with this Disclosure Statement*.

In the belief that no major party will oppose the Plan and that it is in the interest of creditors for the Plan to take effect as soon as possible, *the Debtors have requested the Bankruptcy Court to specify that its order confirming the Plan (the "Confirmation Order") take effect immediately*.  Under the Federal Rules of Bankruptcy Procedure, a confirmation order will ordinarily be subject to a stay of 14 days before it takes effect.  If you object to the Confirmation Order becoming immediately effective, you should be sure to say so in a timely-filed written objection to the Plan.

The Debtors will file a proposed form of the Confirmation Order not later than _____, 2013 [10 Business Days before Voting/Objection Deadline].  The Confirmation Order will bind all holders of Claims and interests, and any successors or assigns of such holders.  *If you object to any provision of the Confirmation Order, you must file an objection to confirmation of the Plan in the manner and within the time described in the notice included with this Disclosure Statement*.

B.     <u>Causes of Action</u>

The Debtors have investigated potential avoidance actions for preference, fraudulent transfer, unauthorized post-petition transfers and setoff under Sections 544, 547, 548 and 549 and 553 of Chapter 5 of the Bankruptcy Code. The Debtors have concluded that they have no meritorious causes of action. Accordingly, the Plan includes a waiver, as of the Effective Date, of any and all causes of action under Chapter 5 of the Bankruptcy Code.

Any and all other causes of action and grounds for objection to Claims are expressly preserved, notwithstanding any action or omission of the Debtors or any statements made or not made in connection with the Plan or this Disclosure Statement. Accordingly, all parties must assume that the rights of the Plan Trustee to prosecute an action or objection to any Claim by or on behalf of the Debtors will not be limited by reason of *res judicata*, collateral estoppel or any other legal doctrine, in connection with the Plan.

C.     <u>Discharge</u>

Under the Bankruptcy Code, a corporate debtor that will not conduct business after the effective date of its plan may not receive a discharge of its debts. Accordingly, the Plan provides that neither Groves nor Apartments will receive a discharge. In order to protect against disruption of the distribution and wind-down process, the automatic stay under Section 362 of the Bankruptcy Code will remain in effect until the cases are closed.

D.     <u>Exculpation, Releases and Injunctions</u>

The Plan provides:

    1.     **Exculpation. Neither the Debtors (subject to Section 8.1 of the Plan), the Creditors' Committee, the Bond Trustee, MHS, the Exhibit B Bondholders (these are holders of Bond Claims who actively participated in negotiating the Plan), nor any of their current or former directors, officers, members, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of the APA, the Plan, this Disclosure Statement or the pursuit of confirmation of the Plan, except for willful misconduct or gross negligence.**

    2.     **Released Parties. In paragraphs 3 and 4 below, the "Released Parties" consist of (a) Benchmark Assisted Living, LLC, BSL, Deaconess, MHS, the Bond Trustee, the Exhibit B Bondholders, and the Creditors' Committee, along with their respective current and former directors, officers, members, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs,**

successors and assigns, and (b) the Debtors' current and former
directors, officers, employees, agents, attorneys, advisors, investment
bankers, other professionals, lenders, investors, members, owners,
shareholders, subsidiaries, other affiliates, heirs, successors and
assigns.  Please note that the Released Parties do not include the
Debtors.

3.　　**Releases by the Debtors and Their Estates**.  **Effective upon the
occurrence of the Effective Date, the Debtors shall, on their own
behalf and on behalf of their respective bankruptcy estates, be deemed
to forever release and discharge the Released Parties (described in the
preceding paragraph) of and from any and all claims, demands,
causes of action and the like, arising from any act, omission, event, or
other occurrence that occurred on or prior to the Effective Date,
whether direct or derivative, liquidated or unliquidated, fixed or
contingent, matured or unmatured, disputed or undisputed, known or
unknown, foreseen or unforeseen, at law, in equity or otherwise;
*provided, however,* nothing in Section 8.3 of the Plan shall release or
discharge BSL from its obligation to make the Contingent Payment
set forth in Section 5.1(e) of the Plan.**

4.　　**Consensual Releases By Holders of Claims**.  **Section 8.4 of the Plan
provides that each entity that votes to accept the Plan shall be deemed
to forever release and discharge the Released Parties of and from any
and all Claims, demands, causes of action and the like, existing as of
the Effective Date or thereafter arising from any act, omission, event,
or other occurrence that occurred on or prior to the Effective Date,
whether direct or derivative, liquidated or unliquidated, fixed or
contingent, matured or unmatured, disputed or undisputed, known or
unknown, foreseen or unforeseen, at law, in equity or otherwise that is
based on, relates to, or in any manner arises from, in whole or in part,
the Debtors, the Debtors' prepetition and postpetition restructuring
efforts, the Cases, negotiation and preparation of the Plan or any
related document, confirmation of the Plan, implementation of the
Plan or any related document, the purchase or sale (or rescission of
the purchase or sale) of any security of the Debtors (including the
Bonds), the transactions or occurrences giving rise to any Claim or
Interest of the releasing entity, or any business or contractual
arrangements between such entity and the Debtors;** *provided,
however,* **that nothing contained in Section 8.4 of the Plan shall
prevent the Bond Trustee from enforcing obligations to MHS under
the LSA.  Notwithstanding the foregoing, (a) in the event that the Plan
is not confirmed, no party shall be deemed to have released or shall
release any claims or be released hereby, (b) Section 8.4 of the Plan
shall not apply to any entity that, on its ballot accepting the Plan,
checks the box next to the words: "The entity submitting this ballot
elects not to, give or receive a release pursuant to Section 8.4 and 8.5**

of the Plan", and (c) Section 8.4 shall not apply to the Bond Trustee's right to receive the Contingent Payment set forth in Section 5.1(e) of the Plan either directly from BSL or through the Debtors.

5.     **Reciprocal Release by Debtors.**  Each entity that is deemed to release the Released Parties pursuant to Section 8.4 of the Plan shall be deemed released by the Debtors such that, effective upon occurrence of the Effective Date, the Debtors shall be deemed to forever release and discharge such entity and all current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise.  For the avoidance of doubt: (i) the Debtors are not authorized and shall not be deemed to release any claim constituting a part of the Purchased Assets; and (ii) the release just described shall not impair the Bond Trustee's right to receive the Contingent Payment set forth in Section 5.1(e) of the Plan.

E.     **Explanation of Releases and Exculpations**

The releases provided in the Plan are critical to the success of the Plan, which assures a distribution for General Unsecured Claims that they otherwise, in all likelihood, would not receive.  The Bond Trustee and the bondholders who accept the Plan are voluntarily authorizing the release of a portion of their collateral to fund payment of Administrative Claims and Plan Expenses.  MHS and Deaconess are voluntarily waiving any right to a distribution on account of their Claims and interests.  But for being released under the Plan, the Debtors' directors, officers, agents and the like would have the right to assert Claims for indemnification that would dilute the distributions to other creditors.   All of the released parties have made significant contributions to the success of the Chapter 11 cases by successfully negotiating arrangements that are expected to lead to confirmation four months after the Petition Date without any major litigation.  In sum, the exculpations and releases provided above are thoroughly appropriate under the circumstances of this case.

XI.     **ALTERNATIVES TO THE PLAN**

As the only available alternative to the Plan, the Debtors' Chapter 11 cases could be converted to Chapter 7 such that liquidation would be accomplished by an appointed bankruptcy trustee rather than by the Debtors (prior to the Effective Date) and the Plan Trustee (from and after the Effective Date).   The Debtors believe that conversion to Chapter 7 has serious disadvantages to all parties in interest.   The Chapter 7 trustee would require time and compensation to get up to speed on the Debtors' affairs, whereas the Plan Trustee is already up

to speed by reason of serving as the Debtors' accountant.  Conversion to Chapter 7 would nullify (a) any amounts available to pay General Unsecured Claims, and (b) the waiver by MHS and Deaconess of their approximately $20,404,566 in Claims.  Even if the Chapter 7 trustee were able to replicate the result of these consensual arrangements through negotiation, the added expense and delay would prejudice creditors.  Distributions to creditors by the Plan Trustee are expected to be completed within two or three months after the Closing, whereas distributions in a Chapter 7 case are seldom made in less than a year.  In sum, the Debtors project that Chapter 7 would cost more money and take more time than completing distributions to creditors and wrapping up the Debtors' affairs pursuant to the Plan, resulting in lesser and later distributions to creditors.

For the foregoing reason, the Debtors have determined, and urge their creditors to conclude, that the Plan is a superior alternative to Chapter 7.

## XII.   RISK FACTORS

Now that the Closing has occurred, the Debtors regard the risk factors concerning the Plan as negligible.

## XIII.   TAX CONSEQUENCES

By reason of their tax-exempt status, the Debtors' do not expect to be subject to any tax consequences as a result of the Plan.  Implementation of the Plan may result in federal, state or local tax consequences to creditors.  Such consequences are beyond the scope of this Disclosure Statement, in that each creditor's situation is different.  Creditors are urged to consult with their own tax advisors as to specific tax consequences to them resulting from the Plan.

## XIV.   ACCEPTANCE AND CONFIRMATION OF PLAN

### A.   Acceptance of the Plan

The Bankruptcy Code provides that any class of creditors whose rights are "impaired" (that is, not fully honored) under a proposed Chapter 11 plan has the right, as a class, to accept or reject the plan.  Each member of the class may vote on this decision.  A class of creditors accepts the Plan if more than one-half of the ballots that are timely received from members of the class, representing at least two-thirds of the dollar amount of claims for which ballots are timely received, are voted in favor of the Plan.

Class 1, consisting of Bond Claims, is impaired and may therefore vote to accept or reject the Plan.  Likewise Classes 4 and 5 – consisting of General Unsecured Claims against Groves and Apartments, respectively – are impaired.

Class 2 (Smaller Secured Claims), Class 3 (Priority Non-Tax Claims), Classes 6 and 7 (Claims and interests of MHS and Deaconess as members of Groves) and Class 8 (inter-Debtor Claims) are unimpaired.  As such, they are deemed to have accepted the Plan and no votes will be solicited from holders of Claims in Classes 2, 3, 6, 7 or 8.

If the Plan is accepted by one of the impaired classes of creditors, disregarding the votes of any insiders included in such class, then the Bankruptcy Code permits the Debtors to request confirmation of the Plan notwithstanding rejection of the Plan by one or more classes. Colloquially this is known as "cramdown."  The Debtors reserve the right to seek to confirm the Plan by means of cramdown if one or more classes reject the Plan.  To do so, the Debtors will be required to – and assert that they will be able to – meet the standards set forth in Section 1129(b) of the Bankruptcy Code as to each rejecting class.  Accordingly, any creditor voting against the Plan who wishes to assert that the Plan may not be confirmed if such creditor's class does not accept the Plan is hereby placed on notice of the need to file an objection to the Plan specifically asserting why the standards of Section 1129(b) have not been met (as well as any other ground for objection to confirmation of the Plan), and to appear at the Confirmation Hearing as required of any objector to the Plan (see Section XIV(C) below).

### B.    <u>Voting Procedures</u>

Included in the same envelope containing this Disclosure Statement is a Ballot by which holders of Class 1, 4 and 5 Claims may vote to accept or reject the Plan.  There are two different forms of Ballot, so please make sure you have received the right one. Holders of Bond Claims (Class 1) who do not hold their Bonds in their own name should have received a ballot headed **Ballot for Bonds Held in Street Name**.  All other creditors entitled to vote (including those who hold Bonds in their own name) should have received a ballot entitled **Ballot to Accept or Reject Plan**.  If you are concerned that you might have received the incorrect ballot, please call Keri Wintle or Ashley Whyman, attorneys for the Debtors, at 617-457-4000.

You should first review this Disclosure Statement and the Plan and then complete the ballot.  For each form of Ballot, instructions for completing and returning the Ballot are found on the Ballot itself but are summarized here.

The **Ballot for Bonds Held in Street Name** should be completed promptly and returned to your brokerage firm or other institution that maintains the account at which your Bonds are held.  That institution is required to complete a master ballot specifying the votes of its client-bondholders and to return the master ballot so that it is received by Globic Advisors, the firm engaged by the Debtors to assist with bondholder solicitation, not later than 4:00 p.m. on August __, 2013 (the "Voting Deadline").  So that your vote will count, you should complete and return your Ballot as soon as possible.

The **Ballot to Accept or Reject Plan** should be completed by holders of General Unsecured Claims (Classes 4 and 5) and by holders of Bond Claims whose Bonds are held in their own name.  **IN ORDER FOR YOUR VOTE TO COUNT, IT MUST BE RECEIVED BY THE DEBTORS' COUNSEL NOT LATER THAN THE VOTING DEADLINE OF 4:00 P.M. ON AUGUST __, 2013.**  Submission of Ballots by electronic mail, telefacsimile, or by any means not including an authorized signature in ink, is prohibited.

All votes to accept or reject the Plan must be cast by using the ballot provided, or a copy of the ballot provided.  The ballot must be signed by the creditor, or an officer, partner or

authorized agent of the creditor.  Ballots signed by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations or others acting in a fiduciary or representative capacity should indicate such capacity and be accompanied by proper evidence satisfactory to Debtors' counsel of their authority to so act.  Please be sure to fill in the name of the creditor on whose behalf the ballot is being filed.

On each ballot there is a space in which to write the Class in which your claim belongs and the amount you believe is the amount of your claim.  Bondholders should be sure to write in the outstanding par amount of their Bonds held rather than their market value as it may appear on their brokerage statements.  These figures are important in promoting an accurate tabulation of votes, but they are solely for reference.  If the Class or amount you fill in differs from the correct Class or actual Allowed Amount of your Claim, then the correct Class and actual Allowed Amount will be used in tabulating your vote.  Also, please be aware that **the amount of the Claim specified on your Ballot will not constitute, supersede or amend any proof of claim for your Claim.**

If an objection to your Claim is pending, your vote will not count unless you file, and the Court grants, a motion under Fed. R. Bankr. P. 3018 for your Claim to be temporarily allowed for voting purposes.  Any such motion must be filed not later than the Voting Deadline, unless the Court determines otherwise.

## C.    <u>Confirmation of the Plan</u>

The Bankruptcy Court must hold a confirmation hearing before deciding whether to confirm the Plan.  Once confirmed, the Plan will become effective on the date the Confirmation Order is entered(the "Effective Date"), provided that the Confirmation Order has not been stayed.  The Debtors intend to request that the Confirmation Order take effect immediately, such that the otherwise-applicable 14-day stay supplied by Fed. R. Bankr. P. 3020(e) will not apply.

A hearing on confirmation of the Plan, and on any objections to the Plan, will be held on August __, 2013 at __:__ _.m., before the Honorable Judge Henry J. Boroff, in the Berkshire Courtroom, United States Bankruptcy Court, United States Courthouse, 300 State Street, Springfield, Massachusetts (the "Confirmation Hearing").  The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment of that hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Objections to confirmation of the Plan are governed by Fed. R. Bankr. P. 9014.  Any objection to confirmation of the Plan must be in writing, and filed with the Clerk's Office, United States Bankruptcy Court, United States Courthouse, 300 State Street, Springfield, Massachusetts 01105.[14]   The objection must also be served on the parties below so that they actually receive it not later than the time it is filed with the Court:

---

[14] Attorneys eligible to file documents electronically using this Court's ECF System may file an objection electronically.

| Counsel to the Debtors: | Daniel C. Cohn, Esq.<br>Murtha Cullina LLP<br>99 High Street<br>Boston, MA 02110 |
| --- | --- |
| United States Trustee: | Eric K. Bradford, Esq.<br>472 Thomas P. O'Neill Jr. Federal Building<br>10 Causeway Street<br>Boston, MA 02222 |
| Counsel to Bond Trustee: | Daniel Bleck, Esq.<br>Mintz, Levin,Cohn, Ferris, Glovsky<br>and Popeo, P.C.<br>1 Financial Center<br>Boston, MA 02111 |
| Counsel to BSL Lincoln, LLC: | Daniel J. Carragher, Esq.<br>Day Pitney LLP<br>One International Place<br>Boston, MA 02110 |
| Counsel to Creditors' Committee: | George W. Tetler, III, Esq.<br>Bowditch & Dewey<br>311 Main Street<br>PO Box 15156<br>Worcester, MA 01615 |

Objections must be filed and served by not later than **4:30 p.m. on August __, 2013** (same as the Voting Deadline).    **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**    Furthermore, in order to pursue an objection, ***the objector must also attend the hearing on confirmation***, either in person or through counsel, except that a corporation may appear only through counsel.  Otherwise, the objection will be deemed to have been waived even if it was timely filed and served.

The Debtors reserve the right, in order to resolve any objection to confirmation of the Plan or otherwise, to modify the Plan, without further notice or disclosure, so long as the modification does not adversely change the treatment of any creditor who has not accepted the modification.

The Plan will be confirmed if it meets the requirements set forth in the bankruptcy law. Among these requirements are:

- *Assenting Impaired Class.*  The Plan must have been accepted by at least one impaired class of creditors, disregarding votes of insiders.

- *Acceptance and Cramdown.*  All impaired classes must have accepted the Plan, except that if any class does not accept the Plan and any member of the class objects on the basis that the Plan does not meet the requirements for cramdown (which are that the Plan must be fair and equitable to, and not unfairly

discriminates against, the objector's class), then the Debtors must persuade the Court to find that the Plan does meet the cramdown requirements.

- *Classification.*  If the holder of a claim objects to classification of such claim, including that the claim was placed in an impermissible class or that another claim was impermissibly placed in the same class as such claim, the Court must find that such claim was permissibly classified.

- *Best Interests of Creditors.*  If any creditor does not accept the Plan and objects on the basis that the Plan does not provide such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation, the Court must find that the Plan does supply such creditor with at least as great a distribution as the creditor would receive in a Chapter 7 liquidation.

- *Feasibility.*  If any creditor objects on the basis that confirmation of the Plan is likely to be followed by the need for liquidation or further reorganization, then the Court must find that the Plan is not likely to be followed by the need for liquidation or for further reorganization except as contemplated by the Plan.

The Debtors believe that the foregoing requirements are or will be met.  If the Court determines that all confirmation requirements are satisfied, it will enter an order confirming the Plan.  The Debtors' proposed form of Confirmation Order will be on file with the Court not less than ten days before the Voting Deadline.  You may obtain a copy by contacting Debtors' counsel; the best way is by email to kbratko@murthalaw.com.

## XV.  <u>CONCLUSION</u>

**The Debtors and Creditors' Committee urge all creditors to vote for and support the Plan, on the basis that the Plan is beneficial to all creditors.**  For holders of Bonds, APA will provide the maximum value for the Debtors' assets under any probable scenario.  For other secured and priority creditors, the Plan provides what is most likely the quickest route to being paid in full.  For general unsecured creditors, the Plan provides a meaningful recovery, even though the Bond Trustee's comprehensive lien on the Debtors' assets would preclude recovery if the Bond Trustee chose to fully enforce its legal priority.  For residents of The Groves, the Plan provides certainty that obligations under their Residency Agreements will be honored.  For MHS and Deaconess, the benefit to residents signals fulfillment of their mission as charitable enterprises dedicated to high quality senior housing.

Respectfully submitted,

THE GROVES IN LINCOLN, INC. and THE APARTMENTS AT THE GROVES, INC.,

Dated:  July 9, 2013                    By _____
                                                Toby Shea,
                                                Chief Financial Officer

33